[No. B016545. Second Dist., Div. Four. Dec. 16, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
HORACE EDWIN BURNS, Defendant and Appellant.

1442

COUNSEL

Donn Dimichele, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John R. Gorey and Lauren E. Dana, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GEORGE, J.—Appellant was convicted, following a jury trial, of four counts of first degree murder (Pen. Code, § 187) with a finding of a multiple-murder special circumstance based on the foregoing convictions (Pen. Code, § 190.2, subd. (a)(3)). In accordance with the jury's determination at the penalty phase of the trial, the court, after denying appellant's motion for new trial, sentenced appellant to life imprisonment without possibility of parole. Appellant challenges his conviction on the following grounds: (1) the trial court erred in instructing the jury that an accomplice must be shown to have shared the intent of the perpetrator of the offense; (2) his Fourth Amendment rights were violated by the admission in evidence of a letter seized by a deputy sheriff who observed appellant passing it to his confederate Tiequon Cox while both were inmates in the county jail, and additionally the trial court erred in not excluding the letter as unduly

prejudicial under Evidence Code section 352; (3) his right to counsel was violated by the admission in evidence of testimony of another inmate relating statements made by appellant at the jail, and additionally the trial court erred in not excluding this testimony as inherently unreliable; and (4) the trial court erred in not instructing the jury sua sponte (a) that in order to convict they were required to agree whether appellant entered the premises where the murders were committed or instead remained inside the vehicle parked in the vicinity of the premises and (b) that in the event the jury found appellant to have been intoxicated at the time of the offenses, it should consider this circumstance in determining whether appellant had the ability to harbor malice aforethought. For the reasons discussed below, we affirm the judgment.

## FACTS

On the morning of August 31, 1984, Ebora Alexander, her daughter Dietria Alexander, and two of Ebora Alexander's visiting grandchildren, Damani Garner (age 13 years) and Damon Bonner (age 8 years), were shot to death in the Alexander home located in the City of Los Angeles. There was evidence indicating that appellant, Tiequon Cox, and Darryl Williams committed the murders out of a desire to retaliate for a shooting that had resulted from the robbery of a drug dealer; however, appellant and his companions went to the wrong house and thus killed the Alexander family instead of their intended victims. The following evidence implicated appellant in the commission of the murders.

On the day in question, Ida Moore and Lisa Brown were at Ms. Moore's house when Darryl Williams arrived with appellant. The women had known Williams for some time and were acquainted with appellant. Williams asked Ms. Moore to take him in her van to "pick up some money from this girl." She agreed but told Williams she needed to get gas. Williams made a telephone call and then, at Williams's direction, appellant left the house but returned a short time later accompanied by Cox.

Williams and Cox went into the kitchen to talk and then reappeared and announced that they were ready to go. They entered the van with Ms. Moore driving, Ms. Brown in the passenger seat, and Williams, Cox and appellant in the back. They first went to appellant's house, which was right around the corner, to get money for gas but appellant was unsuccessful. Ms. Moore then said she had one or two dollars, and they all proceeded to a gas station, where appellant pumped the gas and Ms. Moore paid for it.

When they left the gas station, Williams told Ms. Moore where to drive, and they looked for a certain address which had been written on a piece of a

paper bag. On the way, Ms. Brown heard one of the men in the back of the van say they were going to kill everyone in the house. She did not know which one of the three made that statement.

When they found the address, Williams directed Ms. Moore to park the van down the street but leave the engine running. Williams and Cox got out but, according to the testimony of Ms. Moore and Ms. Brown, Williams directed appellant to remain in the van and appellant did so. Williams was holding a handgun and Cox was holding a rifle wrapped in a blue jacket. This rifle was later identified as an M1, .30 caliber, carbine semi-automatic weapon, a gun used by paratroopers in combat. Neither woman had seen anyone carrying a weapon or any other object prior to this time. As Williams and Cox walked away, Ms. Moore asked appellant what they were going to do. Appellant replied they were going to " 'shoot it up.' "

Williams and Cox entered the Alexander home and shot to death Ebora Alexander, her daughter, and two of her grandsons. Another young grandson, Ivan, escaped by hiding in a closet. The remaining person in the house, Ebora's son Neal, awoke when he heard someone call his name. He ran to his sister's room, where he saw a man holding a rifle. They wrestled until Neal was struck by something, got up, and ran out of the house.

Williams returned to the van followed by Cox, who was still holding the rifle but no longer had the blue jacket that had covered it. Both men told Ms. Moore to "drive fast." Cox added, " 'I just blew the bitch's head off.' " The men, including appellant, directed Ms. Moore where to drive. She stopped the van when she was told to, and all three men exited. The two women drove back to Ms. Moore's house.

About 9 a.m., Ms. Brown, at Williams's request, brought him his car. She then observed Williams hand Cox the rifle, which he put in the trunk. Ms. Brown and Cox drove to an apartment complex, where Cox wrapped the rifle in another jacket, went into the building, and returned without the weapon.

About a month later a police officer saw 17-year-old James Kennedy standing in the courtyard of that apartment building holding the rifle. The weapon, which was loaded, was seized and Kennedy was arrested. Kennedy testified that he had received it from Cox, and ballistics tests confirmed that some of the bullets found in the Alexander home had been fired from this rifle. Cox's palm print was found in the house.

A woman who lived across the street from the Alexanders heard the shooting and saw a person who "looked like" Williams leave the house,

followed a short time later by a person carrying a rifle whom she positively identified as Cox. Another young woman who lived across the street confirmed the identification of Cox as the man with the rifle.

Cox was arrested, and a news story was broadcast concerning his arraignment. Appellant, watching a television report of the court appearance, told Linda Lewis that he did not have to worry about his fingerprints being found in the house because he did not touch anything. He added that he did not have to worry about Cox "snitching" on him "[b]ecause he knew his homeboy wouldn't do him like that." Appellant then went outside and discussed the crime with a group of people. He said that Cox was "just like a time bomb that exploded and when he entered the house he just started shooting everybody everywhere." He explained they were involved in a dispute arising from the robbery of a drug dealer but by mistake went to the wrong house. When someone asked appellant how he felt about killing the children, he responded, " 'That's just something that just happened.' "

Cassandra Haynes also overheard a conversation in which appellant in the company of a group of people discussed the crime. Appellant said that Cox did the shooting and appellant "stood there and watched."

Prior to trial, David Mangola occupied a county jail cell next to appellant's. Appellant told Mangola that a drug dealer who was owed some money had paid appellant $25,000 to $30,000 to commit the murders but that they had gone to the wrong house. Appellant stated that he had entered the house with Cox but that Cox had done all the shooting while appellant watched.

Approximately one month into the trial, a deputy sheriff at county jail seized a letter, written by appellant, just after appellant had handed it to Cox in a hallway while Cox was being escorted to the visiting area. The letter, which was introduced into evidence, proposed a plan by which Cox and Williams would exonerate appellant by testifying that he had nothing to do with the crime and was not in the van. After his release, appellant would sue the city for false arrest and use the money recovered to take care of the families of all three men. The letter contained repeated references to their membership in a street gang called the Rolling 60's Crips and complained that other gang members had done nothing to help them and "did not even try to stop" certain of the witnesses from appearing in court. Appellant also promised that if he were released the families of some of the witnesses were " 'going to suffer for all this.' " Finally appellant wrote, " 'When you come back own [sic] appeal I make sure know [sic] witnesses shows [sic] up.' " Appellant wrote that Cox would not get the death penalty because he did not plan the crime but was doing only what he was ordered to do. Appellant

finished the letter with a reference to the gang, "Notorious W/S Rollin Sixties," and the phrase "Richan Rollin Mafia Style."

Appellant testified in his own defense that the night before the murders he had been out drinking and had gone to bed about 3 a.m. Around 6:30 a.m. Williams came to his door and asked to be shown where Cox lived. When appellant asked why, he was told to " 'shut up and do what I tell you.' " Williams then left, telling appellant to get dressed and meet him around the corner at Ida Moore's house.

When appellant arrived at Ms. Moore's house, Williams gave him the key to his car and told him to pick up Cox. When appellant returned with Cox, Williams and Cox went into the kitchen. When they reappeared, Williams said " 'Let's go.' " As Cox and Williams entered Ms. Moore's van, appellant started to walk home but Williams told him they were going to pick up some money from his girlfriend and asked him to come along. They first went to appellant's house to obtain money for gas, but appellant was unsuccessful. They proceeded to the gas station where, at Williams's direction, appellant pumped the gas. They then drove to the Alexander house with the two women seated in front of the van and the three men in back.

When they arrived, appellant began to get out of the van but Williams directed him to remain. Cox left the van holding an object wrapped in a blue jacket. Williams pulled out a handgun and also left the van. This was the first time appellant had seen either weapon. Appellant asked, " 'What you doin',' " and Williams replied, " 'We're going to scare the people up.' " Appellant heard gunshots. Williams returned to the van followed by Cox, who announced he had shot off a woman's head. At Williams's direction they drove to a location where all three men left the van and entered an apartment. Appellant complained to Williams about his having involved appellant in the crime and then went home.

Appellant testified he was a member of the Rolling 60's gang and followed Williams's orders because Williams was a leader of that gang and "if you don't do what he say [sic], you're in real trouble." Appellant denied making the statements attributed to him by Ida Moore, Lisa Brown, Linda Lewis, Cassandra Haynes and David Mangola. Appellant admitted writing the letter to Cox but explained he was merely attempting to fool Cox into believing that appellant would do the things stated in the letter, such as intimidating witnesses, so that Cox would give false testimony exonerating appellant. Appellant admitted he had been planning to lie by claiming he was not in the van but realized that would not be successful in light of the contrary testimony of Ms. Moore and Ms. Brown.

DISCUSSION

I

THE TRIAL COURT DID NOT ERR IN MODIFYING THE DEFINITION
OF THE TERM ACCOMPLICE CONTAINED IN CALJIC NO. 3.14 TO
REQUIRE THAT THE ACCOMPLICE HAVE HAD A CRIMINAL INTENT
THAT THE OFFENSE BE COMMITTED

 ██ fn. ██ Appellant contends that the trial court erred in modifying CALJIC No. 3.14,[1] a jury instruction providing a supplementary definition of the term accomplice in addition to that contained in CALJIC No. 3.10. As explained below, we conclude that the trial court was correct in modifying the instruction to require that an *accomplice* be shown to have had a criminal intent that the offense be committed, in accordance with the holding in *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] that in order to be convicted of a crime on a theory of aiding and abetting, a *defendant* must be shown to have had a criminal intent that the offense be committed.

Ida Moore and Lisa Brown were crucial witnesses on the issue of appellant's criminal intent. Ms. Brown testified that en route to the murder scene, one of the three men in the vehicle stated that they were going to kill everyone in the house. Ms. Moore testified that as Williams and Cox walked toward the Alexander house, appellant stated that the two men were going to " 'shoot it up.' " The trial court instructed the jury to determine whether Ms. Moore and Ms. Brown were accomplices (CALJIC No. 3.19 (1979 rev.) was given with minor modifications), but appellant asserts that by modifying CALJIC No. 3.14 to incorporate the *Beeman* holding, the trial court instructed the jury to apply an erroneously strict standard in finding whether each woman met the definition of an accomplice.

*Beeman* resolved a conflict in the decisions of the Court of Appeal "between those cases which state that an aider and abettor must have an intent or purpose to commit or assist in the commission of the criminal offenses [citations] and those finding it sufficient that the aider and abettor engage in

---

[1] Reference is made to California Jury Instructions, Criminal (4th ed. 1979).
As conceded in appellant's opening brief, appellant "did not object specifically to the court's modification of CALJIC No. 3.14, although defense counsel did request that the word 'knowledge' also be included in the instruction along with the word 'intent.' " The California Supreme Court has "held it is the duty of the trial court in a criminal case to give, on its own motion, instructions on the pertinent principles of law regarding accomplice testimony ' ". . . whenever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice . . . ." ' " (*People* v. *Gordon* (1973) 10 Cal.3d 460, 466 [110 Cal.Rptr. 906, 516 P.2d 298], fn. omitted.)

the required acts with knowledge of the perpetrator's criminal purpose [citations]." (35 Cal.3d at p. 556, fn. omitted.) The Supreme Court, approving those cases which found mere knowledge of the perpetrator's criminal purpose insufficient, held that "an appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*Id.,* at p. 561.)[2]

Although the Supreme Court in *Beeman* had before it the issue of the intent required of an aider and abettor to be liable as a principal (Pen. Code, § 31), a closely related issue is the intent required to render a person involved in a criminal act an accomplice whose testimony requires corroboration (Pen. Code, § 1111). Accordingly, soon after the decision in *Beeman,* CALJIC No. 3.10 (1984 rev.) (Accomplice—Defined) was revised to reflect the holding in that case.[3] The comment to that revised instruction notes: "The 1984 Revision of CALJIC 3.10 (1984 rev.) is based upon *People* v. *Beeman* . . . , which held that the People are required to prove that an aider and abettor had a criminal intent that the offense be committed. *The Committee is of the opinion that this same principle should apply to an accomplice.*" (Italics added.) We agree with the committee.[4] We see no rationale for making criminal intent that the offense be committed a prerequisite to the conviction of an aider and abettor as a principal—while not making it a prerequisite to the qualification of the aider and abettor as an accomplice. However, despite the 1984 revision of CALJIC No. 3.10 and perhaps inadvertently, no change was made by the CALJIC committee in the wording of CALJIC No. 3.14 (1979 rev.), which declares the following caveat to the definition of an accomplice: "Merely assenting to or aiding or assisting in the commission of a crime without *knowledge of the unlawful purpose of the perpetrator* is not criminal, and a person so assenting to, or aiding, or assisting in, the commission of a crime without such knowledge is not an accomplice in the commission of such crime." (Italics added.)

Notwithstanding the decision in *Beeman,* CALJIC No. 3.14 (1979 rev.) remains a technically correct statement of the law. Framed as it is in

---

[2] The trial court instructed the jury that appellant could be found guilty on a theory of aiding and abetting (CALJIC No. 3.00 (1984 rev.)), further defining that theory (CALJIC No. 3.01 (1984 rev., as modified)) based on the holding in *People* v. *Beeman, supra,* 35 Cal.3d 547.

[3] The 1984 revision of CALJIC No. 3.10 stated, in pertinent part: "To be an accomplice, the person must have aided, promoted, encouraged, or instigated by act or advice the commission of such offense with knowledge of the unlawful purpose of the person who committed the offense *and with the intent or purpose of committing,* encouraging, or facilitating the commission of the offense." (Italics added.)

[4] The Committee on Standard Jury Instructions, Criminal, of the Superior Court of Los Angeles County.

negative terms, it describes what does *not* meet the definition of an accomplice. It thus correctly states that one who assists in the commission of the crime without knowledge of the perpetrator's criminal purpose is not an accomplice. But although technically correct, the wording of the instruction risks leading a jury to believe that the converse is also true; namely, that a person who assists in the crime *with* knowledge of the unlawful purpose of the perpetrator necessarily *is* an accomplice. This is precisely the result *Beeman* sought to avoid in the context of a perpetrator who is charged as a defendant.

To foreclose this possibility, the trial court, in addition to giving CALJIC No. 3.10 (1984 rev.), gave the following modified version of CALJIC No. 3.14 reflecting the holding in *Beeman*: "Merely assenting to or aiding or assisting in the commission of a crime without *sharing the intent of the perpetrator* is not criminal, and a person so assenting to, or aiding, or assisting in, the commission of a crime without such intent is not an accomplice in the commission of such crime." (Italics added.)

The phrase "sharing the intent of the perpetrator" was drawn directly from the opinion in *Beeman,* which states: "When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator." (*Beeman, supra,* 35 Cal.3d at p. 560.) The high court explained its holding as follows: "an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Ibid.*)

In the present case, appellant was on trial for murder, and the case was submitted to the jury on a theory which required a specific intent to kill in order to convict. CALJIC No. 3.14, as modified by the trial court in accordance with the holding in *Beeman,* correctly informed the jury that in the event Ms. Moore and Ms. Brown assisted in the commission of the crime, but did not share the perpetrator's intent to kill, they were not accomplices.[5] We note that CALJIC No. 3.14 is simply a caveat which warns the jury that certain conduct does *not* constitute aiding and abetting. If the jury was unclear concerning the meaning of the phrase "sharing the intent of the perpetrator" as used in the trial court's modified instruction, the issue was

---

[5] In addition to the previously mentioned instructions, the trial court gave the following appropriate instructions pertaining to accomplice testimony: CALJIC No. 3.11 (1979 rev.) (Testimony of Accomplice Must be Corroborated), CALJIC No. 3.12 (1979 rev.) (Sufficiency of Evidence to Corroborate an Accomplice), and CALJIC No. 3.18 (1979 rev.) (Testimony of Accomplice to be Viewed with Distrust).

clarified by the giving of CALJIC No. 3.10 (1984 rev.) which sets forth a more complete definition of the term accomplice.

For the guidance of trial courts we note that the authors of CALJIC have formally adopted a new revision of No. 3.14 for inclusion in the fifth edition of California Jury Instructions, Criminal, scheduled for publication in 1988. That revision appropriately incorporates the *Beeman* holding by providing: "Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging or facilitating the commission of the crime is not criminal. Thus a person who assents to, or aids, or assists in, the commission of a crime without such knowledge and without such intent or purpose is not an accomplice in the commission of such crime."

Appellant cites the Supreme Court's opinion in *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392], in arguing that despite *Beeman,* an accomplice need not "share the intent" of the perpetrator but simply must know that some criminal act is contemplated and intend to encourage that act. However, the footnote in *Croy* relied upon by appellant discussed a well-established *extension* of the general rule of accomplice liability having no application in the present case, namely additional liability for foreseeable offenses: "The requirement that the jury determine the intent with which a person tried as an aider and abettor has acted is not designed to ensure that his conduct constitutes the offense with which he is charged. His liability is vicarious. . . . [H]e is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets." (*Id.,* at p. 12, fn. 5.) This rule extends the liability of the aider and abettor to include not only the crime which is planned but also "any reasonably foreseeable offense committed as a consequence . . . ." (*Ibid.*) An example of such a foreseeable consequence could be the killing of a policeman during a crime spree in which the aider and abettor intentionally participates. (*People* v. *Durham* (1969) 70 Cal.2d 171, 182 [74 Cal.Rptr. 269, 449 P.2d 198].) Even in this example, however, liability is not automatic as it must be established that the aider and abettor "shared with [the perpetrator] an intent to resist arrest at the risk of killing the arresting officers." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 760-761 [230 Cal.Rptr. 667, 726 P.2d 113].)

The present case does not involve an additional offense arising as a foreseeable consequence of the planned crime. The evidence discloses only one crime which was intended by the perpetrators: to kill everyone in the house. The question to be decided by the jury in determining whether Ms. Moore

and Ms. Brown were accomplices was whether they shared that intent. The jury was adequately instructed on this issue.

## II

## THE LETTER APPELLANT WROTE TO COX WAS PROPERLY ADMITTED INTO EVIDENCE

### A. *Appellant Lacks Standing to Challenge the Seizure of the Letter*

Midway through the trial the prosecutor announced outside the presence of the jury that, the night before, appellant had given a letter to Cox as they passed each other in a hallway in the county jail and that the letter had been seized from Cox. Copies of the five-page handwritten letter were given to defense counsel, who stated: "perhaps we should examine this officer regarding how this was recovered, on the record." The prosecutor, noting that "[t]his would be in the nature of [an Evidence Code section] 402 hearing," called as a witness the deputy sheriff who had seized the letter.

The officer testified that he had seen appellant in a hallway in a section of the jail to which appellant was not assigned and to which he was not permitted access. Appellant was walking on one side of the hallway, while the officer was escorting Cox and four other inmates in the opposite direction on the other side of the hallway. A jail rule designates one side of the hallway for traffic in a certain direction while the other side of the hallway is used exclusively for traffic in the opposite direction. As he drew closer to the escorted inmates, appellant crossed to the other side of the hallway toward Cox and handed him a bundle of paper. Cox immediately placed it in his pocket as he turned his body away from the view of the officer, who detained both appellant and Cox, removed the papers from Cox's pocket, and examined them for contraband. Although both appellant and Cox said these were "legal papers from their attorneys," the officer read parts of the letter and saw references to threats against witnesses. Jail rules prohibit any type of communication or physical contact in the hallways during movement from one location to another.

At the conclusion of this testimony, the prosecutor asserted that appellant had no standing to object to the search or seizure of the letter. In response, defense counsel stated, "We would raise that objection, however,

as to its admissibility on the legality search [*sic*]." No additional argument was offered, and the trial court denied the motion to suppress the letter.

■ In order to bring a motion to suppress evidence, the defendant must show that " 'the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect. . . .' " (*In re Lance W.* (1985) 37 Cal.3d 873, 882-883 [210 Cal.Rptr. 631, 694 P.2d 744], quoting *Rakas* v. *Illinois* (1978) 439 U.S. 128, 140 [58 L.Ed.2d 387, 399, 99 S.Ct. 421].) A defendant bears the burden of proving that he had a legitimate expectation of privacy in the area searched. (*Rawlings* v. *Kentucky* (1980) 448 U.S. 98, 104 [65 L.Ed.2d 633, 641, 100 S.Ct. 2556].) (4) Thus appellant had the burden of proving that Cox's pocket, from which the letter was seized, was an area in which he had a legitimate expectation of privacy.

A similar issue was addressed in *Rawlings* v. *Kentucky, supra,* 448 U.S. 98, in which the defendant stored illegal drugs in the purse of a woman he had known for only a few days. The United States Supreme Court upheld the state court's finding that the defendant had failed to meet his burden of establishing his legitimate expectation of privacy in the purse. Among the factors supporting this conclusion were that the defendant had not previously enjoyed access to the purse and had no right to exclude other persons from such access. In fact, there was testimony that recently a third person had looked through the purse in search of a personal item.

In the present case, appellant made no attempt to sustain his burden of proof. Neither appellant nor Cox testified at the motion to suppress evidence, and nothing in the deputy sheriff's testimony touched upon the issue of appellant's reasonable expectation of privacy. The record does not establish that appellant could exert any control over access to Cox's pocket or that he had reason to believe that the letter would not be seen by others. Accordingly, appellant was not free to challenge the legality of the search, and the motion to suppress evidence was properly denied.

■ Appellant argues that apart from whether Cox's pocket was an area in which he had a legitimate expectation of privacy, he did have a reasonable expectation of privacy in the contents of the letter, once seized from Cox's pocket, which was violated when the letter was read by the officer. This argument is flawed in several respects. First, this rather novel issue was not raised in the trial court and thus cannot be raised for the first time on appeal. (*People* v. *Manning* (1973) 33 Cal.App.3d 586, 601 [109 Cal.Rptr.

531].) Second, appellant failed to introduce any evidence which could support this theory. The testimony of the officer indicated that such communications in the hallways were prohibited. Appellant did not attempt to establish that he was unaware of this rule, and we therefore assume he knew that a letter passed in a hallway in the presence of an officer was likely to be intercepted. The record is also silent concerning the existence of any other jail rules which would affect the reasonableness of appellant's alleged belief that his letter would remain private. (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 81 [222 Cal.Rptr. 127, 711 P.2d 423].) In discussing searches of the cells of pretrial detainees, the United States Supreme Court observed that "given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope." (*Bell* v. *Wolfish* (1979) 441 U.S. 520, 557 [60 L.Ed.2d 447, 480, 99 S.Ct. 1861].) The high court also noted that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees. [Fn. omitted.]" (*Id.,* at p. 546 [60 L.Ed.2d at p. 473].) It has been held that jail inmates have no expectation of privacy in the contents of letters they send through the mail. (*People* v. *Phillips, supra,* 41 Cal.3d at pp. 79-81; *People* v. *Garvey* (1979) 99 Cal.App.3d 320, 323 [160 Cal.Rptr. 73]; *People* v. *Manson* (1976) 61 Cal.App.3d 102, 152 [132 Cal.Rptr. 265].) Because the issue was not raised below, however, neither the prosecutor nor the trial court in this case had an opportunity to address the issue and we decline to do so on the record before us.

Finally, appellant erroneously relies on the decision in *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142], which held that a civil class action suit seeking injunctive and declaratory relief stated a cause of action against the practice of county jail officials of monitoring ostensibly private conversations between pretrial detainees and their visitors for the purpose of discovering evidence for use in criminal trials, rather than for the purpose of institutional security or public protection. (*Id.,* at pp. 867-868.) It is readily apparent that the decision in *De Lancie* is factually distinguishable and, additionally, offers little guidance in the situation before us since *De Lancie* involved a civil cause of action, premised on Penal Code sections 2600 and 2601 and pursued in order to protect the civil rights of prisoners, while the present case involves a motion to suppress evidence based on an alleged violation of federal constitutional rights. (*People* v. *McCaslin* (1986) 178 Cal.App.3d 1, 6 [223 Cal.Rptr. 587].) The decision in *De Lancie* thus has no bearing on our conclusion that the trial court correctly denied the motion to suppress evidence.

## B. *The Issue Whether the Prejudicial Effect of the Letter Outweighed Its Probative Value Cannot Be Raised for the First Time on Appeal*

 In addition to the foregoing contention that the letter should be suppressed because it was illegally seized, appellant's only other objection in the trial court to its admissibility was that the letter did not constitute relevant evidence. The trial court ruled that the letter was relevant, later adding that "fabricating evidence is certainly consciousness of guilt," but ordered that those portions of the letter referring to statements of the attorneys be deleted. Appellant, however, objected to any portion of the letter being deleted, stating: "Either the document should come in in its entirety or it shouldn't come in at all." Subsequently, while being cross-examined, appellant personally requested that the deleted portions of the letter be admitted into evidence. His attorneys agreed, and those portions were admitted.

On appeal, appellant contends that the letter should have been excluded because its probative value was outweighed by its prejudicial effect within the meaning of Evidence Code section 352. Such an argument may not be raised for the first time on appeal. "The *sine qua non* for invoking the protection of Evidence Code section 352 is a request at the trial level that the court exercise its discretion." (*Gherman* v. *Colburn* (1977) 72 Cal.App.3d 544, 581 [140 Cal.Rptr. 330].) Appellant made no such request in the trial court and may not raise the issue for the first time on appeal.

The trial court's ruling that the letter was relevant is clearly correct. The letter proposes a plan to fabricate evidence to exonerate appellant. It indicates appellant's willingness to lie, by claiming he was not present at the scene of the crime, in the event he were able to persuade his friends to tell the same lie. This evidence was highly relevant concerning appellant's consciousness of guilt. (*People* v. *Thomas* (1979) 96 Cal.App.3d 507, 510 [158 Cal.Rptr. 120]; *People* v. *Ott* (1978) 84 Cal.App.3d 118, 127-128 [148 Cal.Rptr. 479].)

The letter's references to gang membership were also relevant since both the sender and the recipient were fellow gang members whose gang affiliation had been an integral factor in the apparent plan to execute the intended victims in retaliation for the shooting which occurred in the aftermath of the robbery of the drug dealer. This evidence supported an inference that appellant was not merely a passive companion with no knowledge

of what Williams and Cox planned to do but was rather a fellow gang member and close associate of the two perpetrators and intimately involved in a joint criminal retaliatory endeavor. As this court stated in *People v. Frausto* (1982) 135 Cal.App.3d 129, 140 [185 Cal.Rptr. 314], "It is proper to introduce evidence of membership in a gang or any type of group which relates to a question in issue . . . ." (See also *People v. Harris* (1985) 175 Cal.App.3d 944, 957 [221 Cal.Rptr. 321].)

III

## The Issue Whether the Testimony of the Jailhouse Informant Was Properly Admitted Into Evidence May Not Be Raised on Appeal in the Absence of an Objection in the Trial Court

■ David Mangola testified to incriminating statements made by appellant while housed in an adjoining cell in county jail. Mangola had previously acted as an informant for various law enforcement agencies. Prior to this testimony, defense counsel on several occasions expressed an interest in how Mangola came to be placed in the cell next to appellant's.

Mangola was called as a witness at a hearing held outside the presence of the jury. When the prosecutor asked about the purpose of the hearing, defense counsel replied that it was "for the purpose of determining the authenticity of the statement and to go into his background" and for "further discovery . . . [b]ecause he refused to talk to us." When the prosecutor later objected to one of the questions posed to the witness, defense counsel responded by repeating that "[t]his is in the nature of discovery at this point." Mangola's testimony denied that he had initiated the conversations with appellant and that he had acted at the direction of any law enforcement officer in conversing with appellant. Appellant did not move to exclude the testimony of Mangola, and therefore the trial court did not rule on the admissibility of this testimony. Mangola later testified before the jury without objection.

Appellant argues on appeal that the admission in evidence of Mangola's testimony violated appellant's right to counsel and that Mangola's testimony should have been excluded because "it [l]acked [s]ubstantial [c]redibility." It is axiomatic that in order to raise an issue on appeal concerning erroneous admission of evidence, a *specific* and *timely* objection

to its introduction must be made in the trial court. (Evid. Code, § 353; see *People* v. *Szeto* (1981) 29 Cal.3d 20, 32 [171 Cal.Rptr. 652, 623 P.2d 213].) Thus appellant cannot now raise this issue on appeal.

IV

THE TRIAL COURT HAD NO DUTY TO INSTRUCT THE JURY SUA SPONTE THAT THEY MUST AGREE UNANIMOUSLY ON THE ACT THAT CONSTITUTED THE OFFENSE

Confirming the testimony of Ms. Moore and Ms. Brown, appellant's testimony admitted that he was in the van at the time of the killings. Other witnesses testified to pretrial admissions in which appellant asserted that he actually entered the house but "just stood there and watch[ed]" Cox shoot the victims. Appellant argues that the trial court had a duty to instruct the jury sua sponte in accordance with CALJIC No. 17.01 that "in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts." On the facts of this case, no such instruction was required.

An argument similar to appellant's was rejected in *People* v. *Harris, supra,* 175 Cal.App.3d 944. In that case, the two codefendants were seen running away from the murder victim after he had been shot. One witness testified he saw defendant Harris shoot the victim and another said she saw Harris holding the gun. A third witness told the police prior to trial that he had seen defendant Harris shoot the victim and that Harris later admitted the crime, but at trial the witness testified that it was codefendant Thomas who shot the victim. Defendant Thomas also made two out-of-court admissions that it was he who had shot the victim.

Defendant Thomas argued that the jury should have been instructed that it must agree unanimously "on which combination of acts it found sufficient to support a finding of first degree murder." (*Id.,* at p. 952.) The Court of Appeal rejected this argument based on the well-established rule that " 'in a prosecution for first degree murder it is not necessary that all jurors agree on one or more of several theories proposed by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by the statute.' " (*Ibid.,* quoting *People* v. *Milan* (1973) 9 Cal.3d 185, 194-195 [107 Cal.Rptr. 68, 507 P.2d 956].) The court concluded that "the facts here

established only one act of homicide, accomplished by the rapid infliction of two gunshot wounds." (*Id.,* at p. 953.)

In *People* v. *Forbes* (1985) 175 Cal.App.3d 807, 816 [221 Cal.Rptr. 275], appellant argued "that it was error for the court not to instruct on its own motion that the jurors must unanimously agree on which of two theories—direct perpetration or aiding and abetting—they relied in finding him guilty of murder." The court disagreed, stating: "An aider and abettor is defined by California statute as a principal in the offense equally guilty with the perpetrator. [Citations.] It follows that jurors need not unanimously agree by which statute the defendant attains his status as a principal in the crime." (*Id.,* at p. 817.) *People* v. *Scott* (1985) 170 Cal.App.3d 267, 270 [215 Cal.Rptr. 618], held that the jury need not be instructed to agree on the acts in deciding whether the defendant was guilty as an aider and abettor to robbery or an accessory after the fact.

In the present case, the only criminal acts charged were the four counts of first degree murder. The only theory relied on by the prosecution was that appellant was an aider and abettor. It was undisputed that appellant was at the scene of the crime. The issue for the jury to determine was whether he knew of the unlawful purpose of the perpetrators and had the intent to encourage or facilitate the commission of the offense. Appellant's exact location during the commission of the offense was only one element of the circumstantial evidence of his state of mind. Being in the van or actually entering the house would not constitute separate criminal acts upon which the jury must unanimously agree.

■ "A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged. . . . [T]he possibility of disagreement exists where the defendant is accused of a number of unrelated incidents, such as alleged rapes at different times or places, leaving the jurors free to believe different parts of the testimony and yet convict the defendant. . . . [¶] If under the evidence presented such disagreement is not reasonably possible, the instruction is unnecessary." (*People* v. *Gonzalez* (1983) 141 Cal.App.3d 786, 791-792 [190 Cal.Rptr. 554]; see also *People* v. *Schultz* (1987) 192 Cal.App.3d 535, 539-540 [237 Cal.Rptr. 513]; *People* v. *Perryman* (1987) 188 Cal.App.3d 1546, 1550 [234 Cal.Rptr. 181]; *People* v. *Ruiz* (1957) 155 Cal.App.2d 59, 61 [317 P.2d 80].) ■ In the present case, such disagreement is not reasonably possible. Appellant admitted he was in the van at the time of the crime, thus agreeing with the testimony of the only other two witnesses who also were present in the van. It is not reasonable to

assume that some of the jurors might have rejected this undisputed evidence that appellant was in the van and instead convicted him based on his possible presence in the house. For this reason, and because of the immateriality of appellant's precise location at the scene as an aider and abettor, the trial court did not err in failing to instruct the jury sua sponte in accordance with CALJIC No. 17.01 that they had to agree unanimously on the act or acts constituting the offense.

V

## The Trial Court Had No Duty to Instruct the Jury Sua Sponte on the Effects of Voluntary Intoxication

Appellant testified that the night before the crime he had been drinking and had stayed up until 3 a.m. On the morning of the crime he had a "hangover" and was "tired" and "drowsy." Appellant argues, based on this evidence, that the trial court had a duty to instruct the jury sua sponte regarding the effects of voluntary intoxication on appellant's ability to harbor malice aforethought. We find no error.

In *People* v. *Cram* (1970) 12 Cal.App.3d 37 [90 Cal.Rptr. 393], Presiding Justice Gardner wrote: "In the absence of a request, the trial court must instruct on the general principles of law relative to the issues raised by the evidence but need not instruct on its own motion on specific points developed at the trial. . . . There must be *substantial* evidence on the issue sufficient to alert the trial judge that it is an issue in the case. There is no duty on the trial court to dissect the evidence in an effort to develop some arcane, remote or nebulous theory of the evidence on which to instruct. The duty of the trial court involves percipience—not omniscience." (*Id.,* at p. 41, italics in original.) "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually . . . harbored malice aforethought . . . ." (Pen. Code, § 22, subd. (b).) "[T]he mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of even a requested instruction thereon. [Citation.] Evidence of intoxication which calls for a *sua sponte* instruction must be substantial." (*People* v. *Cram, supra,* 12 Cal.App.3d at p. 44. See also *People* v. *Sanchez* (1982) 131 Cal.App.3d 718, 735 [182 Cal.Rptr. 671].)

In the present case there was no evidence that appellant was intoxicated at the time of the crime. Appellant testified merely that he had a hangover

and did not get a full night's sleep. This does not constitute substantial evidence that he may have been unable to form the requisite specific intent. A jury instruction regarding the effects of voluntary intoxication was not required.

## DISPOSITION

For the foregoing reasons, we affirm the judgment of conviction.[6]

Woods, P. J., and McCloskey, J., concurred.

A petition for a rehearing was denied January 13, 1988, and appellant's petition for review by the Supreme Court was denied March 31, 1988.

---

[6] Appellant's final argument is that the cumulative effect of the errors he alleges requires reversal. This argument need not be addressed since we find that no error occurred.

Appellant's opening brief also makes reference to several instances of misconduct allegedly committed by the prosecutor during argument although not objected to by appellant. Appellant's reply brief, however, explains that no contention is being made that misconduct occurred and twice states that "Burns' argument was not that the statements constituted prejudicial misconduct . . . ." Appellant's counsel made the same concession at oral argument, stating that "for purposes of appeal" he was "not raising the issue." Thus we need not address this matter.