Filed 3/6/13  P. v. DaSilva CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061233 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF25800) |
| MICHAEL DaSILVA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher W. Yeager, Judge.  Affirmed.

Michael DaSilva appeals his conviction of conspiracy to bring drugs into a state prison (Pen. Code,[1] § 182, subd. (a)(1); Health & Saf. Code, § 11350, subd. (h)) and his restitution fine (§§ 1202.4(b); 1202.45).  He contends the trial court violated his constitutional and administrative rights when it denied his motion to suppress the

---

1    All further statutory references are to the Penal Code unless otherwise inidicated.

contents of a letter marked "legal mail" and that a $240 restitution fine violated the constitutional prohibition against ex post facto laws. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[2]

Correctional Officer Samuel Sandoval is part of the Centinela prison's Investigative Service Unit (ISU) and is trained on the prison's Inmate Monitoring Automated Recording System (IMARS) and in drug and narcotics recognition. On August 2, 2007, Officer Sandoval was randomly scanning IMARS telephone conversations. He heard a conversation between DaSilva and his wife Shaw Marie DaSilva.

Officer Sandoval testified he heard DaSilva asking his wife: "if [she] got the stuff?" DaSilva's wife replied, "I'm waiting on Bobby's stuff, but I'm actually ironing." They also discussed whether to send the "stuff" in one package or two. According to Officer Sandoval, "ironing" is a way to conceal heroin within the mail and "stuff" is generally a "common word used by inmates to identify a narcotic or certain illegal item[s]."

Officer Sandoval deduced from the conversation that DaSilva and his wife were conspiring to introduce a controlled substance into the prison. Officer Sandoval contacted the prison mailroom and asked the mailroom to notify ISU if any mail addressed to DaSilva arrived.

---

[2]     We view the evidence in the light most favorable to the judgment. (*People v. Gaut* (2002) 95 Cal.App.4th 1425, 1427.) Certain portions of the factual and procedural history are discussed *post*.

On August 3, 2007, two U.S. mail envelopes arrived for DaSilva labeled "legal mail" and ISU was duly notified. Another ISU Officer, Dana Mortimer, intercepted the mail on behalf of Officer Sandoval. When Officer Mortimer arrived at the mailroom, he received the envelopes and was told they looked a "little strange on the x-ray." Officer Mortimer also x-rayed the envelopes and found there were "several large black blots on the screen." Unlike normal papers that are transparent under the x-ray, these envelopes had "different shapes in the packet."

Both envelopes bore a return address of "Callahan & Associates," with a San Diego street address. However, Officer Mortimer could not find that address on a list of California attorneys maintained by the prison mailroom. Officer Mortimer found there were two Callahan & Associates in San Diego; however, neither firm's address matched the street address which appeared on the envelopes addressed to DaSilva. Officer Mortimer then delivered the unopened envelopes to Officer Jesus Diaz who was in charge of delivering legal mail to inmates.

Under California Department of Corrections and Rehabilitation (CDCR) regulations legal mail is opened by a correctional officer in front of the inmate whose name appears on the address. Officer Diaz had been alerted that DaSilva's "legal mail was going to be containing some controlled substances . . . ." Officer Diaz logged the envelopes, then paged DaSilva and directed him to report to the program office. Upon arrival, DaSilva showed proof of identification and signed for his mail. Officer Diaz placed DaSilva in handcuffs and moved him to a holding cell. Officer Diaz then opened

3

the two envelopes in front of DaSilva.[3] Officer Diaz testified that when he opened the envelopes he saw "two sheets of paper . . . glued together." However, Officer Diaz did not have the equipment to separate the paper; therefore, he could not determine why they were stuck together.

Officer Sandoval received the envelopes from Officer Diaz, and removed the papers from the envelopes to find "bogus paperwork . . . [containing] . . . old police reports, just random copies of papers . . . ." Officer Sandoval separated the "glued" papers and found a "black sticky substance between [the] two sheets of paper." The substance tested positive for heroin.

DaSilva was indicted for conspiracy to bring drugs into a state prison (§§ 182, subd. (a)(1), 4573), and for possession of an illegal substance in a prison facility (§ 4573.6). The indictment alleged DaSilva committed the offenses while confined in a state prison (§ 1170.1, subd. (c)) and DaSilva had four prior strike convictions.

DaSilva filed a motion to suppress evidence under section 1538.5 and following a hearing, the trial court denied the motion. In particular the court found that, even though the correctional officers treated the envelopes as legal mail and opened them in DaSilva's presence, the envelopes in fact were not legal mail and were subject to inspection outside of DaSilva's presence. In determining that the envelopes could be treated like any other inmate mail, the court noted that the correctional officers were aware DaSilva's wife

---

3    There was some confusion in the record about whether the envelopes were opened in front of DaSilva. The trial court found the confusion arose from taking the grand jury testimony out of proper sequence rather than inconsistent statements.

4

might be sending him contraband, the x-ray scan revealed something irregular in the contents of the envelopes and the return address on the envelope did not match the list of attorneys maintained by the prison.

Pursuant to *People v. West* (1970) 3 Cal.3d 595, DaSilva then agreed to plead guilty to a single amended count of conspiracy to commit possession of a controlled substance (§ 182, subd. (a); Health & Saf. Code, § 11350, subd. (h)) with an admitted prior strike conviction for robbery. The court sentenced DaSilva to a lower term of 16 months in prison with an additional 16 months to be served consecutively because of the prior strike conviction. The court also imposed a $240 restitution fine for the crime committed (§ 1202.4(b)) and an additional, suspended $240 parole revocation restitution fine. (§ 1202.45.)

## DISCUSSION

### I

DaSilva contends the trial court erred in denying his motion to suppress. He asserts that in opening the envelopes, prison officials violated constitutional, statutory and administrative limitations on his powers. We find no error.

Primarily we rely on the fact that there is nothing in the record which suggests the envelopes inspected by the correctional officers contained any confidential attorney-client communications. Rather the unambiguous record shows the envelopes, although labeled legal mail, were in fact solely a means of introducing contraband into the prison. Given these circumstances, in opening the envelopes the correctional officers did not in

5

any manner intrude on DaSilva's Sixth Amendment right to counsel or on any cognizable right to privacy that arose during his incarceration.

Moreover, there is nothing in this record to support DaSilva's contention that any of his statutory or administrative rights were infringed.

A. Standard of Review

In a proceeding to suppress evidence under section 1538.5, the trial court is vested with the power to judge the credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw inferences of fact. (*People v. Lawler* (1973) 9 Cal.3d 156, 160.) "In reviewing the denial of a motion to suppress, an appellate court defers to the trial courts express or implied findings of fact that are supported by substantial evidence . . . ." (*People v. Middleton* (2005) 131 Cal.App.4th 732, 737.) Under the substantial evidence standard, we examine the entire record in the light most favorable to the trial court decision and draw all reasonable inferences in support of that decision. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.) We neither evaluate the credibility of witnesses nor reweigh the evidence. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631-632.) However, the issue of whether a search or seizure was reasonable under the facts found is a question of law for which the appellate court must exercise its independent judgment. (*People v. Loewen* (1983) 35 Cal.3d 117, 123.)

B. Prisoner Privacy

Prisoners have no constitutionally protected expectation of privacy while they are incarcerated and thus no expectation that their mail will not be opened and inspected by prison officials. (See *People v. Harris* (2000) 83 Cal.App.4th 371, 376; *People v. Burns*

6

(1987) 196 Cal.App.3d 1440, 1454; see also *Hudson v. Palmer* (1984) 468 U.S. 517, 522 (*Hudson*.)  "A prisoner's theoretical expectation of privacy simply yields to the institutional security of the prison."  (*People v. Harris*, *supra*, at p. 376.)  "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."  (*Pell v. Procunier* (1974) 417 U.S. 817, 823.)

In *Hudson*[4] an inmate argued a random " 'shakedown' " search of his prison cell for contraband was a violation of his constitutional right to privacy under the Fourth Amendment.  (*Hudson*, *supra*, 468 U.S. at p. 519.)  In finding no such right to privacy the court stated "[p]risons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for anti-social criminal, and often violent, conduct."  (*Id*. at p. 526.)  The court concluded that "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order.  We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security."  (*Id.* at pp. 527-528, fn. omitted.)

---

4       DaSilva relies on a pre-*Hudson* case, *United States v. Savage* (9th Cir. 1973) 482 F.2d 1371, 1373, in which the court found photocopying and reading an inmate's letter was a violation of the inmate's Fourth Amendment rights.  In light of *Hudson*, *United States v. Savage* is no longer persuasive authority with respect to a prisoner's right to privacy.

7

C. Legal Mail

Although a prisoner has no general right to privacy, there are statutory and administrative limitations on the power of prison personnel to inspect a prisoner's confidential communications with his or her attorney. (See § 2601, subd. (b); *In re Jordan* (1972) 7 Cal.3d 930, 938-939 (*Jordan I*); *In re Jordan* (1974) 12 Cal.3d 575, 579 (*Jordan II*).) In particular section 2601, subdivision (b), which permits inspection of incoming mail to search for contraband, also expressly provides a prisoner with the right to "correspond, confidentially, with any member of the State Bar or hold of public office . . . ."

In *Jordan I*, an inmate challenged a prison regulation which prohibited confidential correspondence between an inmate and his attorney. Our Supreme Court held that the regulation was inconsistent with the right to confidential correspondence provided by former section 2600, subdivision (2), the predecessor to section 2601, subdivision (b), and was therefore invalid. (*Jordan I*, *supra*, 7 Cal.3d at p. 939, fn. 4.) The court suggested that the prison could insist that letters from attorneys be opened in the presence of prison guards to assure that they do not contain contraband, but that they could not ban all such correspondence. (*Id*. at pp. 938-939.) The court further suggested that prison officials could assure themselves that correspondence was to or from counsel by checking the purported lawyers' names against a list provided by the State Bar. (*Id*. at p. 939.)

In *Jordan II*, the same inmate challenged a regulation which permitted prison officials to read any printed material contained in otherwise confidential attorney communications. The Supreme Court rejected the regulation as potentially intruding on the attorney-client privilege and serving no institutional interest. (*Jordan II*, *supra*, 12 Cal.3d. at p. 580.) The court reiterated its earlier determination that there was only a "remote and wholly speculative danger that an attorney, sworn to obey the laws of this state, would assist a prisoner in avoiding legitimate prison regulations [citation] or conspire in plots that threaten prison security." (*Id*. at p. 579.)

Consistent with *Jordan I* and *Jordan II*, the state prisons adopted regulations which attempt to protect the confidentiality of attorney-client communications and at the same time safeguard valid institutional security interests. California Code of Regulations Title 15,[5] section 3141 (c)(6), expressly permits inmates to have confidential communications with attorneys.

Section 3143 of the regulations in turn prescribes the procedure for processing incoming confidential mail and states:

"Incoming letters must show the name, title, return address and the office of persons listed in Section 3141 on the outside of the envelope to be processed as confidential correspondence. An attorney's return address *must* match the address listed with the State Bar. A notice or request for confidentiality is not required on the envelope. Correspondence that is appropriately addressed with a return address that indicates it may

---

[5] All further administrative references are to title 15 of the California Code of Regulations unless otherwise specified.

9

be confidential shall be processed and treated as confidential correspondence whether or not it is stamped as such.

"(a) Designated staff shall open the letter in the presence of the addressed inmate at a designated time and place. Staff shall not read any of the enclosed material. Staff shall remove the pages and shake them to ensure the absence of prohibited material.

"(b) Inmates shall sign for all confidential mail at the time of delivery. This shall be accomplished by use of a permanent logbook or use of receipts. If receipts are used, the receipts shall be forwarded to the mailroom for filing. The log book at a minimum must record the date of delivery, the inmates name and departmental identification number, and the senders name and address." (Cal. Code Regs., tit. 15, § 3143.)

D. Analysis

Because as a prisoner DaSilva had no expectation of privacy, he cannot assert he was the victim of any unreasonable search or seizure within the meaning of the Fourth Amendment. (See *Hudson*, *supra*, 468 U.S. at pp. 527-528; *People v. Harris*, *supra*, 83 Cal.App.4th at p. 376; *People v. Burns*, *supra*, 196 Cal.App.3d at p. 1454.) Because the envelopes did not contain any confidential attorney-client communications, in opening the envelopes prison officials did not intrude in any manner on DaSilva's Sixth Amendment right to counsel. Thus, DaSilva has no colorable claim his constitutional rights were invaded when the envelopes were opened and their contents discovered.

10

The fact that the envelopes did not contain any attorney-client confidential communications of course also forecloses any claim the prison infringed on the statutory right to such communications provided by section 2601, subdivision (b) and Evidence Code section 954.

This leaves us with DaSilva's contention that correctional officers who opened his mail failed to observe the requirements of sections 3141 and 3143 of the prison regulations. The difficulty here is two-fold: first, a simple breach of DaSilva's rights under the prison's regulations, standing alone, will not support any suppression of evidence. (See Cal. Const., art. 1, § 28; *People v. Poe* (1983) 145 Cal.App.3d 574, 580.)

Second, the record shows that, in any event, no breach of the regulations occurred. Section 3143 of the regulations requires that an attorney's address on an incoming piece of mail match the attorney's address as it is listed by the state bar. The trial court properly found envelopes addressed to DaSilva did not meet this requirement. Although on appeal DaSilva notes that Officer Mortimer was unable to confirm that the prison's list was provided by the State Bar, the trial court could rely on the presumption that official duties have been regularly performed and that the prison therefore relied on a State Bar list of attorneys. (Evid. Code, § 664). We note that for his part, DaSilva made no attempt to show the address, which appeared on the envelopes for Callahan & Associates, matched the firm's address as listed by the bar. The relative ease with which this might have been accomplished in the trial court is telling, but not at all surprising in light of the fact that heroin was in fact discovered in the envelopes. As the court in *Jordan II* noted, it is very unlikely that an attorney would send contraband to an inmate. Because the

11

envelopes did not meet the requirements of the prison's regulations, the prison officials were not required to treat them as legal mail.

In sum, the record shows that in opening the envelopes the prison did not infringe on any of DaSilva's constitutional, statutory or administrative rights. Thus the trial court did not err in denying DaSilva's motion to suppress.

## II

DaSilva also contends the court violated the ex post facto provisions of the federal constitution when it imposed a $240 restitution fine under section 1202.4, subdivision (b).

In 2007 when DaSilva committed the offense, section 1202.4, subdivision (b)(1) stated, "[t]he restitution fine shall be set at the *discretion* of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars and not more than ten thousand dollars." Section 1202.4, subdivision (b)(1), as amended in 2011 and effective January 1, 2012, provides for a minimum $240 fine.

DaSilva claims the court erred because it imposed a $240 fine instead of the $200 statutory minimum that was applicable in 2007. DaSilva believes the trial court intended to impose the statutory minimum and therefore erroneously imposed the minimum applicable in 2012, rather than the minimum which governed crimes committed before then. DaSilva relies on the fact that the sentencing documents prepared in December 2011 imposed a $200 fine which, by handwritten amendment, was increased to $240 at or near the time sentence was imposed in January 2012. We are not persuaded by DaSilva's argument.

12

The court is presumed to have followed the correct law, even if it did not explicitly state the law it was applying. (*Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 562.) An appellant has the burden of affirmatively showing error. The sentencing court in this case made no reference to applying the statutory minimum for the restitution fine. As the Attorney General notes, the trial court may have decided, as a matter of discretion, that in this case it was appropriate to raise DaSilva's fine to at least the minimum level imposed on other offenders. The trial court plainly had the discretion to do so without offending the constitutional limitation on ex post facto laws.

## DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

McINTYRE, J.

AARON, J.

13