Filed 6/3/13  P. v. Barker CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B233873 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA045492) |
| v. | |
| STACEY MARIE BARKER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Hayden Zacky, Judge.  Affirmed.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Stacy Marie Barker (defendant) appeals from the judgment entered upon her conviction of murder and related crimes. Defendant contends that the trial court erred in denying her motion for a change of venue, her *Batson/Wheeler* motion,[1] and her *Massiah* motion.[2] She also contends that the trial court unduly restricted cross-examination, that evidentiary rulings and instructional error deprived her of a fair trial and due process, that her conviction of first degree murder was not supported by substantial evidence, and that cumulative error deprived her of a fair trial. In addition, defendant asks that we review the in camera proceedings held pursuant to her *Pitchess* motion.[3]

## BACKGROUND

**Procedural history**

Defendant was charged with three felony counts relating to the death of her 18-month-old daughter Emma Barker (Emma):[4] first degree murder in violation of Penal Code section 187 (count 1);[5] assault on a child under the age of eight, causing death in violation of section 273ab (count 2); and child abuse in violation of section 273a, subdivision (a) (count 3). Count 3 specially alleged infliction of unjustifiable pain on a

---

[1] See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).)

[2] See *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*).

[3] See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*); Penal Code sections 832.7 and 832.8; Evidence Code sections 1043 through 1047.

[4] To avoid confusion we refer to the members of the Barker family by their first names after first mention. No disrespect is intended.

[5] All further statutory references are to the Penal Code, unless otherwise indicated.

child by a caretaker under circumstances likely to produce great bodily harm and death, and resulting in death, pursuant to section 12022.95.[6]

After a jury trial, defendant was convicted of all three counts as charged. The jury found the murder to be in the first degree and found true the special allegations. On June 17, 2011, the trial court sentenced defendant to 25 years to life in prison on count 1. As to count 2, the court imposed a term of 25 years to life and stayed the term pursuant to section 654. As to count 3, the court imposed a prison term of six years, enhanced by six years under section 12022.7, subdivision (d), and also stayed pursuant to section 654. Defendant's actual presentence custody credit was 786 days. The court imposed mandatory fees as well as a restitution fine of $10,000 and a parole revocation fine of $10,000, stayed pending successful completion of parole.

Defendant filed a timely notice of appeal.

**Prosecution evidence**

### *Defendant's pregnancy; Emma's birth and life*

Defendant moved back into the family home after she became pregnant with Emma. Emma was born September 2, 2007. Her father, Anthony Hannaford (Hannaford), lived in Long Beach and although defendant never took Emma to Long Beach to visit, Hannaford and his mother periodically travelled to Lancaster. Hannaford had no contact with defendant between December 2008 and Emma's death on March 18, 2009. Defendant knew Hannaford's cell phone number, but not his addresses or that of his mother, in Long Beach.

Defendant's mother, Susan Barker (Susan), testified that defendant was on leave from work for three months following Emma's birth and did not go out socially during that time. Susan thought defendant took good care of Emma and was never abusive. Defendant's younger brother Nickolas Barker (Nickolas) testified that defendant did not

---

[6]     This special allegation was modified prior to verdict to section 12022.7, subdivision (d), personal infliction of great bodily injury on a child under the age of five years.

3

lose her temper with Emma or hit her, and merely punished her with an occasional "No." When defendant resumed her social life, she usually went out after putting Emma to bed. Susan, Nickolas, or defendant's father Gary Barker (Gary) would babysit. When defendant returned to work, Susan switched to a night shift to care for Emma while defendant worked from 5:30 a.m. to 2:30 p.m. Nickolas also lived in the home and helped care for Emma.

Defendant met Brendon Borrelli (Borrelli) on New Year's Eve, 2008. Thereafter, they regularly talked, exchanged text messages up to 75 times per day, had sex at Borrelli's house, and lunched together on workdays. They spent increasingly more time together, usually in the evening after Susan left for work. Defendant began coming home very late, spending less time with Emma and putting her to bed earlier. Even when defendant was home, she often ignored Emma in favor of sending text messages to Borrelli.

Borrelli was 23 years old at the time and did not want children. Borrelli had almost no interaction with Emma. When he visited defendant, Borrelli usually arrived after Emma was in bed, and the few times he saw Emma, it was either a short visit or he watched television during their time together. Defendant confided in Nickolas that Borrelli did not want to spend too much time with Emma or take responsibility for her. Defendant expressed concern to Borrelli that Emma might scare him away.

While seeing Borrelli, defendant had several sexual encounters with Nickolas's friend, Mario Villalobos (Villalobos). Villalobos testified that he saw defendant and Emma together occasionally at softball games where he and Borrelli played. Villalobos noticed that although other team members often came out of the dugout to greet defendant and Emma, Borrelli never did. Defendant explained to Villalobos that Borrelli preferred to avoid her when she was with Emma.

Nickolas testified he noticed that defendant would often drop everything to focus completely on her boyfriends, wanting to spend all her spare time with them, sometimes to the point of scaring them away. Before Emma was born, defendant became so

4

involved with a Hispanic man that she dyed her hair black and tanned herself in an effort to look Hispanic.

Defendant and Borrelli celebrated Saint Patrick's Day 2009 by drinking beer at a bar, taking a drive, and then having sex at Borrelli's house. Defendant returned home at 4:00 a.m. on March 18, 2008, about two hours before she was scheduled to begin work. Though she dressed for work, at 5:30 a.m., defendant called in sick and went back to Borrelli's house, where they slept until noon before going to lunch together. Over lunch, defendant and Borrelli discussed the potential of a relationship between Borrelli and Emma. Defendant reported that Hannaford was out Emma's life and added that she was not getting along well with Susan. Borrelli told defendant that he preferred to postpone any relationship with Emma until he determined what he wanted to do in life and was sure that he could handle something as "big" as that.

Defendant returned home sometime after 3:00 p.m. and she and Susan argued about defendant's late arrival. It was a loud argument, and as in previous arguments, Susan told defendant that she would watch Emma only while defendant was at work. This time Susan told defendant to stop going out or find another babysitter. Defendant responded that she could not make anyone happy, adding, "I can't make you happy. I can't make work happy and I can't make my boyfriend happy." Susan left the house at 3:30 p.m.

### *Emma's death and the initial investigation*

About 4:30 p.m. defendant told Nickolas she was taking Emma to the park. Defendant sent Borrelli a text message about the fight with her mother and that she was taking Emma to Lancaster Park.[7] At 5:21 p.m., defendant sent another text message that she was at the park with Emma and they were fine.

Borrelli sent defendant several text messages before getting off work, but received no response until about 10:30 p.m., when she called him, sounding hysterical. She said that "they took her" and she was at the Palmdale Park and Ride facility. Borrelli picked

---

**7** Borrelli testified he had recently warned defendant that Lancaster City Park was in a bad neighborhood and that she should carefully watch Emma there.

5

up Nickolas at the Barker home, and on the way to the Park and Ride facility, Nickolas called 911. They found defendant sitting in her car wearing just her underwear, crying hysterically. Sheriff's deputies arrived soon after, followed by an ambulance and defendant's parents.

Deputy Scott Shean testified that defendant told him she placed Emma in her car seat at 5:30 p.m. after visiting Lancaster City Park, and then opened the driver's door. The next thing defendant remembered was waking up at 10:30 p.m. at the Palmdale Park and Ride; she found her cell phone, looked at the time, and looked in the back for her daughter. Deputy Shean testified that defendant was two or three minutes into her explanation before she mentioned that her daughter was missing.

Defendant had a small bump on her head and some scratches. She was transported to the hospital where a deputy remained with her throughout the night. Defendant did not ask whether her daughter had been found. At 3:00 a.m., defendant was given a sexual assault exam by a forensic nurse who observed recent scratches on defendant's inner and outer labia and anus, but could not determine how the injuries were sustained. During the exam, defendant was quiet and gloomy, with poor eye contact; she said her daughter was missing, but did not mention Emma again. After leaving the hospital in the early morning of March 19, defendant was taken to the Palmdale Sheriff's Station and interviewed. Defendant gave essentially the same story about Lancaster City Park as she had given to other deputies.

Sherriff Detective Nicholas Cannis of the Major Crimes Bureau began investigating the kidnapping report soon after defendant was found at the Park and Ride. He testified that after obtaining defendant's cell phone records for March 18, he traced the movement of defendant's cell phone southward between 4:24 p.m. and 5:22 p.m., and then its northward movement later in the evening, by determining through which cellular towers her calls and text messages had been routed. Defendant's cell phone travelled from the Antelope Valley to the 405 Freeway in Los Angeles. At 9:09 p.m., when she received a text message or call from Borrelli and responded, defendant was near the Los Angeles International Airport. Defendant then travelled north, and by 9:50 p.m., she

6

was within one mile of the place where Emma's body was found the next morning, and within 39 miles of the Palmdale Park and Ride.

When defendant was confronted with the discrepancy between the cell tower information and her version of events, she told detectives that Emma had accidentally died and she had left her body in Sylmar. At approximately 11:00 a.m., defendant led deputies to the location. Defendant claimed that while driving to Long Beach to seek help from Emma's father, she handed Emma her purse to play with, not knowing there was a plastic sandwich bag (baggie) inside. Defendant realized that Emma had choked on the baggie when she looked back sometime after Emma became very quiet, and saw that Emma was no longer moving.

### Defendant's second interview

Sherriff Sergeants Shaun McCarthy and Sandra Nava interviewed defendant again that evening. A recording of the interview was played for the jury. Defendant said she had decided to go to Long Beach to ask Hannaford for financial assistance. Defendant repeated the explanation about the purse and baggie, and said she decided to make it appear that she had been raped because she did not want to be considered a bad mother.

When Sergeant McCarthy asked defendant whether she stopped to check Emma's breathing, defendant replied that she did not stop for 30 to 45 minutes because she was sure Emma was not breathing. Defendant explained that she knew Emma was dead rather than sleeping, because she was slumped over with the baggie in her mouth, and Emma never slept with her head hanging over in that manner. When she finally stopped, defendant took the baggie from Emma's mouth and threw it out the window on the way home. Defendant occasionally looked back at Emma, saw that her eyes were closed, her lips were purple, and she had a bit of blood coming from her nose. Defendant did not call for paramedics because she was frightened.

After Sergeant Nava expressed disbelief in much of the story, defendant admitted she knew that Emma had been playing with a baggie, claiming that while she drove, she played a peek-a-boo game by tossing Emma's blanket over her head. Defendant surmised that the blanket caught on the safety clip of the car seat and pushed the baggie

7

into Emma's mouth. Defendant then said she had played with the baggie by holding it up to Emma's face while playing peek-a-boo with the blanket. Emma grabbed her arm at first, and then, defendant explained, "I held [the blanket] for a couple of minutes and then I kind of felt her hands let go." After a few minutes, she removed the blanket and saw a "little bit more than half" the baggie in her mouth. When asked whether Emma had struggled, defendant replied that she thought so, adding, "I think that's why when she was grabbing my arm, I thought she was just playing with me, but she was trying to breathe." Defendant said, "I think I suffocated her."

After a break, the interview continued with Sergeants Nava and Marsh. Defendant did not realize Emma could not breathe or that this was the reason Emma pulled at her arm; nor did she realize that two or three minutes had passed, or when she held the blanket against Emma's face she was also holding the baggie. Defendant denied she held the blanket there on purpose. When Sergeant Marsh expressed doubt whether she could have held the blanket over Emma's face while driving on the freeway at 65 miles per hour, and Sergeant Nava demonstrated the difficulty she would have in reaching back, defendant replied that she was driving 65 or 70 mph.

*Reaching experiments*

Sergeant Nava and crime scene reconstruction expert Paul Delhauer testified regarding their attempts to recreate defendant's peek-a-boo game in defendant's Mazda, with a mannequin in the child seat. Sergeant Nava was the same height as defendant, but her hip to heel measurement exceeded defendant's by one inch and Sergeant Nava's reach was longer by one-half inch. Trying the driver's seat in the most forward position, Sergeant Nava was not able to touch the mannequin. In a driving position that was comfortable for Sergeant Nava, she could reach the mannequin, but had to lift her hips off seat and stretch back on her tiptoes. With the seat all the way back, Sergeant Nava could not reach gas pedal or steer the car.

*Time and cause of death*

When Los Angeles County Coroner investigator Denise Bertone (Bertone) arrived at the place where Emma's body was found, about three hours later, she took

8

photographs, examined the body, noted physical characteristics, took a rectal temperature, and prepared a report for the medical examiner. Bertone testified that among other things, she observed blood on Emma's nostril and upper lip.

Medical examiner James Ribe, M.D. testified that he performed the autopsy. Due to Emma's position and degree of rigor mortis, he estimated the time of death at approximately three or four hours before being placed where her body was found. Dr. Ribe testified that the toxicology screen revealed diphenydramine (Benadryl) in Emma's system, in an amount above the normal therapeutic level.[8] He explained that the medicine was active against allergies, but was also a mild sedative that was sometimes used as a sleeping aid, and would have made Emma sleepy.

Dr. Ribe was unable to determine the cause of death with certainty, but ruled out all possible causes except asphyxia. Dr. Ribe did not see blood on Emma's nostril, but the blood was visible in the photographs taken where her body was found. He explained that blood in the nose of infants was usually associated with suffocation by facial occlusion, accomplished either by squeezing the nose or by exerting pressure on the lower face. The ensuing struggle to breathe would rupture the small capillaries in the nasal membrane, resulting in bleeding. Choking on a plastic bag would not cause blood in the nose.

### At the Barker home before defendant's arrest

After defendant returned home from the sheriff's station, she told her family she had been heading toward Hannaford's home intending to seek financial help from him and that Emma died accidentally. Nickolas testified that as far as he knew, Hannaford had no money. Nickolas and Susan both testified that defendant was about to receive an income tax refund of approximately $5,000.

Defendant told Nickolas that when Emma became fussy on the drive, defendant gave Emma a granola bar and defendant's purse to play with, and when defendant turned around to look at Emma, she saw that Emma was dead. Defendant then pulled off the

---

[8]   Emma had a peanut allergy for which she was prescribed medication, an "EpiPen" and Benadryl. Susan testified that she did not give Emma any medication that day.

9

freeway and took the baggie from her mouth. Defendant told Susan that as she was playing peak-a-boo with Emma's blanket, a baggie somehow got into Emma's mouth, and when the blanket became caught on the back of the car seat, Emma accidentally suffocated. Defendant admitted to them that she had invented the abduction, hit her own head on the steering wheel, and threw her clothes away to support the story. Susan testified that when she asked defendant whether she had tried to save Emma, defendant said no, and expressed no regret. Defendant did not cry while telling the story of Emma's death, but cried after Susan confronted her about the story and accused her of killing Emma.

Friends and family gathered at the Barker home the evening before the funeral. Villalobos testified that he saw people, including defendant, playing a game of beer pong. Defendant appeared to be intoxicated and giggled.

Susan testified that she did not sit next to defendant at the funeral service. She admitted telling detectives that she believed that defendant had killed Emma.[9] Susan was afraid of defendant, felt unsafe, and locked her bedroom door at night until defendant moved away a few weeks after Emma's death.[10] Susan had not visited defendant during her two years in custody before trial.

Susan frantically called Sergeant McCarthy and asked him to arrest defendant because she was planning to go to Texas. Nickolas told Sergeant McCarthy that he had overheard a conversation between defendant and Borrelli about leaving for Texas.

A portion of a telephone conversation between Gary and defendant, recorded at the jail in January 2010 was presented to the jury. In the conversation, after defendant told Gary that she was angry with Borrelli, she stated: "He said that he wished that the

---

[9]     Susan claimed that Sergeant Nava tricked her into believing defendant killed Emma. Susan also testified that she was afraid that if her statements about defendant got back to her husband she would lose him.

[10]     Defendant moved after a sign was put on the front lawn reading "Baby killer lives here," and someone drove by yelling, "Baby killer." Defendant went to live with her grandfather for several weeks before her arrest.

10

police would have believed my first story so that I could be out there with him." Sergeant Nava testified that when she spoke to Susan alone on March 24, 2009, Susan said that she knew her daughter did this and needed Sergeant Nava to prove it.

### John Doe's testimony

The prosecution called a witness identified to the jury as John Doe (Doe)[11] to protect his privacy. Doe testified he was serving a prison term at the time of trial and his case had been pending in the Antelope Valley court at the same time defendant was in custody awaiting trial. Their court dates coincided and he met defendant on the bus from jail to the courthouse. After they became acquainted, defendant talked about the charges against her, and Doe believed her claim of innocence at first, but grew skeptical after he read about the case in a newspaper and defendant gave inconsistent accounts. Because he disliked crimes against children, Doe contacted homicide detectives to provide them with information.

During their conversations, defendant told Doe she was "pissed off" at her boyfriend because he was out there watching football and having a blast while she was sitting in jail. She said he owed her and that they should have kept to the original story. Defendant never admitted killing Emma, but always maintained that her death was an accident.

Doe gave defendant his mailing address but warned her his mail was monitored. The trial court admitted 12 of the letters defendant sent to Doe in November and December 2009, and January 2010. On some letters and envelopes, defendant made elaborate drawings of flowers, butterflies, musical instruments, or a kissing cartoon couple. Defendant addressed Doe as dearest, called him handsome, told him he had beautiful eyes and what she loved about him. In January, the letters became more passionate. Defendant called Doe "babe," her "very own true love," and her "vampire."

---

[11]    Outside the jury's presence, the court and counsel referred to Doe as "X"; the parties refer to him in their briefs as Doe in summarizing his testimony and as X elsewhere; we refer to him as Doe.

11

Defendant wrote that she prayed they would be released soon so that they could "fully enjoy one another, emotionally and physically"; that her heart was in his hands; that she wanted to "see what's underneath all the clothing. Be able to touch and caress each other. Look deep into each other's eyes till we can see our souls." Loyalty and honesty were common themes in the letters. For example, defendant wrote: "Everything between us will be based on complete loyalty, honesty and trust. . . . Yes, I do see myself, you and me, in a completely faithful, honest and healthy relationship. . . ."

**Defense evidence**

### *Gary Barker*

Defendant's father testified that defendant had participated in sports in high school, made good grades, and exhibited no violent tendencies or irrational behavior. Defendant took care of herself during her pregnancy and took vitamins; she did not take drugs or become intoxicated; she read about diet and baby development; and she never said she did not want the baby. She appeared to be as "happy as could be" before Emma's birth and overjoyed afterward. Defendant took responsibility for Emma's care, prepared fresh vegetables for her, and paid for everything. Gary saw three new outfits for Emma the night before she died.

For Emma's first year, defendant stayed home all the time; later she socialized but did not neglect Emma. Defendant was a good mother, enjoyed her time with Emma, and did not spank, hit, or slap the child. After December 31, 2008, defendant started going out more. Gary did not notice any change in defendant's interaction with Emma after defendant met Borrelli, but he worked long hours and was usually asleep when Borrelli came over.

When detectives came to the door after Emma's body was found, Susan asked, "Did she kill her?" Gary was upset with Susan for thinking that defendant could have killed Emma, because he knew defendant could not have done it. At the time of trial Gary still visited defendant every other weekend; he loved her, was concerned for her, and would do anything he could properly do for her.

Gary described defendant's mood during the beer pong game the night before Emma's funeral, as sad and tired. Someone had to persuade her to get out of bed and come play with them. Gary also explained about Texas: one day, after Susan attacked defendant in bed, Gary's father offered defendant the chance to stay at his house until the tension settled. Gary's sister, who lives in Texas, was there and offered to give defendant a place to stay after everything was over.

### Other defense witnesses

Gary's sister, Kimberlee Barker, testified that she lived in Texas, and offered to let defendant come live with her after everything was resolved. Borrelli testified he spent more time at the Barker house after Emma's death than before because defendant needed a friend and he was there for her. Defendant's supervisor, Jennifer Goodnight (Goodnight), testified that she spoke to defendant at work daily. When they discussed their children, defendant sometimes spoke negatively about Emma. Defendant posted photographs of Emma in her work station, and when Goodnight noticed that they had been taken down, she informed Detective Nava. Defendant's grandfather Lawrence Barker, testified that when defendant came to live with him, she seemed to be depressed and in shock. She cried and slept a great deal.

### Defendant's testimony

Defendant explained that she took down the photographs of Emma at work because she shared her desk with evening shift part-time employees.

Defendant was working two jobs when she discovered she was pregnant in January 2007, but quit one of them and gave up her apartment after a near miscarriage. Defendant found that moving back home with her parents required an adjustment, as she was not on good terms with her mother. She bought books on pregnancy and a yoga video, kept all her doctors' appointments, prepared her bedroom for Emma, and took a Lamaze class with her mother. Defendant's family was excited about the baby and defendant felt supported. She was prescribed bed rest during the last few weeks of her pregnancy, and Emma was born a week and a half early.

Defendant testified that her relationship with Hannaford began in November 2005 and was never serious or steady. Hannaford told defendant that he never wanted children. He wanted her to have an abortion, but defendant decided that she wanted the baby. Defendant had dated others before Hannaford, as well as two other men during the time they were together, although they were just "flings." Defendant denied ever stalking or trying to control Hannaford. She denied trying to change her looks when she lived with a Hispanic man, and claimed that she ended that relationship because he was abusive.

Defendant put Emma in day care when she first returned to work, then with defendant's maternal grandparents when the day care provider did not take proper care of Emma, and finally with Susan in January 2008. Defendant claimed she came straight home from work to take care of Emma, and that she played with her, fed her dinner, and bathed her, with no variance in her routine, other than socializing with her friend Amber, Amber's children and Emma. Defendant denied dating or going out to bars during Emma's first six months.

Defendant's social life resumed New Year's Eve 2008, when she met Borrelli at a bar where she was celebrating. Defendant claimed her relationship with Borrelli was not serious, that she never declared love for him or tried to control him, and that she dated other people at the same time, including Villalobos, with whom she had sex two or three times. Defendant estimated she went out socially about 12 times in 2008, and not always with Borrelli. Defendant claimed she told Borrelli that Emma came first, and they both agreed to take things slowly. Defendant denied that she loved Borrelli or that having a man in her life was more important than Emma.

On March 17, 2008, Gary agreed to babysit so defendant could go out with friends. Defendant met Borrelli at a bar after putting Emma to bed. They remained at the bar until nearly 2:00 a.m., and then went for a drive before defendant dropped Borrelli off and went home. Defendant slept for about two hours, called in sick to work and then went back to Borrelli's house, where they slept until about 1:00 p.m. before going out to lunch. Over lunch defendant and Borrelli discussed their relationship, Emma, and

14

Hannaford. Defendant told Borrelli that if they were to become more serious, she would like him to visit more often and get to know Emma. Borrelli said he would see what he could do, but defendant was not convinced, and was ready to end the relationship if Borrelli did not put an effort into his relationships with both her and Emma.

When defendant went home after the lunch with Borrelli, Susan was upset because defendant had spent the day with Borrelli rather than going to work. The ensuing argument lasted 15 minutes, but defendant denied screaming. After telling Nickolas she was taking Emma to the park, defendant put two or three diapers, some diaper wipes, and a sippie cup in her purse, took some snacks, Emma's blanket and Bear Bear, and left between 3:30 and 4:00 p.m.

Defendant did not recall a discussion with Borrelli about the dangers of Lancaster City Park. She testified she intended to go to the park, but once in the car, she decided to go to Long Beach to ask Hannaford to help her move out of the house before she was evicted by Susan. Defendant did not want to go back home and felt she had nowhere else to go. She did not consider Borrelli to be her boyfriend at that time; Amber had her "own situation"; and defendant's brother Matthew was not speaking to her. She thought that Hannaford was her last resort. His mother had told her to call if she needed anything. However, defendant did not try to call either of them. She did not call or text Hannaford because he did not always answer and she assumed he would not take her call. Defendant intended to call them once she arrived in Long Beach, or figure something else out if she did not reach them.

Defendant denied that she killed Emma and denied that she killed her before leaving Lancaster. Defendant claimed she did not think anything was wrong with giving Emma her purse when she became fussy because Emma had played with it before. Emma had also played with a baggie; she like operating the zipper. When Emma grew tired of the purse, defendant picked up Emma's blanket and played a peek-a-boo game for 15 or 20 minutes. Defendant explained that she tossed the blanket because she drove with the seat almost all the way forward and could not touch Emma's face from that

15

position. She denied holding the blanket against Emma's nose and suffocating her. She also denied giving Emma Benadryl, claiming that she gave her baby Tylenol.

Defendant testified that after awhile she looked back, saw that the blanket was still covering Emma, and when she pulled it off, saw that Emma's lips were purple and her face was bluish. Defendant did not call 911 or pull over because she was in the middle of traffic, could not get over, and was scared and uncertain what to do. Defendant continued driving until she reached Cherry Avenue in Long Beach, where she pulled over, got into the back seat with Emma, and found the baggie in her mouth. Without removing Emma from the car seat, attempting to resuscitate her, or even verifying she was alive, other than feeling her face, defendant removed the baggie, sat for awhile, and then drove home.

Defendant threw the baggie out the window, but denied she intended to eliminate evidence, claiming she discarded it because she blamed herself for having given Emma the baggie and causing her death. Defendant continued to drive for 30 or 40 minutes, and when she looked at Emma periodically in the rearview mirror, she could tell that Emma was dead. Defendant claimed she left Emma's body in Sylmar and made up the kidnapping story because she was afraid she would get into trouble for being irresponsible. She denied that anyone helped her and claimed that Borrelli took no part in Emma's death or her attempt to cover it up.

The next day (March 19, 2009), after taking the deputies to Emma's body, defendant returned to the Palmdale Sheriff's Station around 1:00 p.m., but was not interviewed again by Detectives McCarthy and Nava again until 9:20 p.m. Defendant remained at the Sheriff's station until 2:00 a.m. the next day, and although she was able to sleep on and off during that time, she was tired and wanted to go home. She claims it was fatigue that caused her to give conflicting statements. After several hours of questions by McCarthy and Nava, she would have said anything they wanted.

Regarding her conversations with Doe, defendant said when they first met he appeared to believe her and told her not to discuss her case with anyone or write anything down. Later, he questioned her quite a bit and wanted to coach her so that her story would make sense. Defendant denied that she and Borrelli ever discussed getting their

16

stories straight, and it was Borrelli, not her, who said that he wished the police had believed her first story so they could be together.

## DISCUSSION

### I. Motion for change of venue

Defendant contends that the trial court erred in denying her motion for change of venue. As the moving party, defendant bore the burden in the trial court to demonstrate her need for a change of venue. (*People v. Lewis* (2008) 43 Cal.4th 415, 447 (*Lewis*).) On appeal, "the defendant must show both that the court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it was reasonably likely that a fair trial was not in fact had. The trial court's essentially factual determinations as to these factors will be sustained if supported by substantial evidence. We independently review the trial court's ultimate determination of the reasonable likelihood of an unfair trial. [Citations.]" (*People v. Edwards* (1991) 54 Cal.3d 787, 806-807, fn. omitted; see § 1033, subd.(a).)

"Both the trial court's initial venue determination and our independent evaluation are based on a consideration of five factors: '(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim.' [Citations.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1394 (*Leonard*).)

### A. Factor Nos. 1, 4, and 5

Defendant has not established error based on factor Nos. 1, 4, or 5, as her position lack merit. First defendant contends the trial court failed to consider the general attitude toward murderers of children. As respondent points out, the trial court did in fact give serious consideration to the victim's age, but concluded a child victim would evoke sympathy in any jurisdiction. Thus finding that this factor was not grounds for a change in trial location.

Defendant does not argue that the trial court failed to consider defendant's community status or the prominence of the victim, but instead suggests that the trial court

should have given greater weight to the fact of a baby victim and thus a sympathetic and tragic figure in the community, as well as the 20 years defendant and her family lived in the area and the fact that defendant participated in local sports. These arguments are not persuasive as there is no indication that either the family or the child victim were so prominent locally as to have an effect on trial proceedings. The trial court was not required to give particular weight to any single factor. (*Lewis*, *supra*, 43 Cal.4th at p. 451.) There was no error.

### B. Factor Nos. 2 and 3

Regarding the nature and extent of the media coverage and size of the community, defendant contends that she established that there was "unrelenting local media coverage in this very high profile case." However, defendant's contention that the media characterized her as a murderer and "baby killer" from the day Emma's body was found to the commencement of trial finds no evidentiary support in the record. In fact, despite her burden of proof, defendant submitted no evidence; instead she relied exclusively on her attorney's written and oral arguments which she has summarized here as though they were evidence. Defendant now invites this court to do its own internet search to find media coverage of this case and asks that we take judicial notice of United States Census Bureau statistics. We decline her invitation, as respondent rightly objects and defendant has not attached copies of documents to be judicially noticed. (*People v. Hardy* (1992) 2 Cal.4th 86, 134-135.)

We thus limit our review of pretrial facts and the size of the community to those judicially noticed by the trial court. (See *People v. Preslie* (1977) 70 Cal.App.3d 486, 493.) As defendant did not submit articles, recordings, studies, or declarations, the trial court's observations comprised the extent of the evidence of pretrial publicity. The court was aware that when Emma died and defendant was arrested, there was a "flurry of media coverage, including coverage in the national media" and statewide media, and that "Nancy Grace even did a piece on this particular case." The court took judicial notice that the combined population of Palmdale, Lancaster, and other areas from which jurors were drawn was more than 450,000. Nearly two years had passed between Emma's

18

death and jury selection, and the trial court noted that the publicity had diminished in that time.[12]

There was no evidence of the nature of the publicity. Even extensive media coverage will not warrant a change of venue unless it was unfair or inflammatory or other factors require a change of venue. (*People v. Farley* (2009) 46 Cal.4th 1053, 1083-1084.) Further, the passage of time since the most extensive media coverage may attenuate any prejudice. (*People v. Ramirez* (2006) 39 Cal.4th 398, 434.) The California Supreme Court held that a change of venue from a community of 405,000 people was properly denied where the publicity was not shown to have been unusual, unfair, or inflammatory, and thus unlikely to have had a prejudicial effect upon prospective jurors. (*People v. Balderas* (1985) 41 Cal.3d 144, 178.) Here, the community was larger, and although the trial court acknowledged that media coverage had been extensive in the beginning, there was no evidence that articles or commentary were anything but straightforward and factual or that the coverage continued to be extensive.[13]

Further, defendant has not demonstrated that media coverage prejudiced the jury panel. The record of voir dire may show the extent of the prospective jurors' exposure to pretrial publicity and possible bias. (*People v. Fauber* (1992) 2 Cal.4th 792, 819.) Here, although the prospective jurors answered written questionnaires designed to determine which people held some bias due to pretrial publicity, the questionnaires have not been made part of the appellate record and defendant does not contend that there were any particular responses that show the extent or nature of the pretrial publicity or the bias any

---

[12] Defense counsel agreed that national publicity had subsided, but argued that locally it had not. No evidence supported counsel's representation.

[13] With no supporting evidence, defense counsel argued that "gossip magazine shows such as Nancy Grace on CNN have . . . [depicted defendant] as an evil [demon]." Now, again without evidence, defendant's reply brief repeats counsel's argument, suggesting that the statement is a quote from Nancy Grace's "rant."

such publicity may have caused.[14]  Nevertheless, defendant argues that the record of voir dire shows that 48 percent of the first group, 27 of 60 prospective jurors, had "indicated some sort of bias because of their knowledge of the case gleaned from the media" and all but five were excused for cause;[15] and that 10 prospective jurors in the second group had been "exposed to media accounts of the case."

The purpose of defendant's meager analysis of voir dire is not clear, but defendant apparently seeks to show that a large percentage of prospective jurors had been exposed to media coverage of the case, thus demonstrating that trial in that community would be unfair.  However, "there is no requirement that jurors be totally ignorant of the facts of a case, as long as they can lay aside their impressions and render an impartial verdict. [Citation.]" (*Lewis*, *supra*, 43 Cal.4th at p. 450.)  In *Lewis*, 72 percent of the potential jurors had heard something about the case, but an absence of prejudice was suggested by the fact that most of them "remembered the case only in general terms, seemed to have no independent recollection of the facts, and had not prejudged defendant's guilt." (*Ibid*.)

In any event, defendant's assertion that between 20 and 45 percent of the panel had heard of the case does not establish extensive media coverage.  Indeed, after reading the juror questionnaires, the trial court expressed surprise that the number of people with media exposure was less than expected.  After the jury was selected, the court was "very pleasantly surprised at the lack of media knowledge" on the part of most jurors.  Moreover, defendant has not shown that the affected jurors' recollections were specific or that any juror, other than those who were excused, had prejudged defendant's guilt.  In fact, none of those exposed to media coverage who remained after the questioning

---

**14**    The trial court commented that some of the responses of those who had been exposed to media coverage were "fairly innocuous."

**15**    After respondent challenged defendant's characterization of voir dire, defendant adjusted her argument, asserting in her reply brief that all but five were excused, not for cause, but during "the initial voir dire where the focus clearly was on media exposure."

20

focused on that issue could remember many details, and all of them told the court they had not prejudged defendant's guilt and could be fair and impartial jurors.

### C. No prejudice

We conclude the trial court properly considered the five factors set forth in *Leonard*, and defendant has failed to meet her burden to prove her claim that the pretrial publicity was extensive, unrelenting, pervasive, or inflammatory. The trial court did not err in denying the motion, and regardless, there was no prejudice.

To show prejudice, defendant repeats her argument, unsubstantiated by evidence, that there was nonstop publicity, that a large percentage of prospective jurors were exposed to the publicity, causing the victim to become a "cause célèbre." As we have already concluded defendant failed to provide evidence of extensive or inflammatory pretrial publicity, we do not presume prejudice. (See *Lewis*, *supra*, 43 Cal.4th at p. 450.) Moreover, respondent represents that only one juror was seated despite having heard of the case, and that defendant failed to exercise all her peremptory challenges.[16] Defendant's failure to use her remaining peremptory challenge, identify any sitting juror who had been exposed to pretrial publicity, or to identify any sitting juror she challenged for cause, demonstrates that the denial of the motion did not result in an unfair trial. (*People v. Farley*, *supra*, 46 Cal.4th at p. 1085 & fn. 8.)

We conclude that defendant has failed to demonstrate prejudice by showing a "reasonable likelihood, as opposed to a mere possibility, that [she] did not in fact receive a fair trial before impartial jurors. [Citation.]" (*Lewis*, *supra*, 43 Cal.4th at p. 450; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 943.)

## II. *Batson/Wheeler* motion

Defendant contends that the prosecutor used peremptory challenges to systematically exclude men from the jury. The use of peremptory challenges to remove

---

**16** Defendant implies that she used all available peremptory challenges because the trial court rejected one challenge pursuant to the prosecutor's *Wheeler/Batson* motion. In fact, the defense had one unused challenge available, but defense counsel felt "forced" not to use it for fear that the trial court would grant another *Wheeler/Batson* motion, which might prejudice the jury against him or defendant.

21

prospective jurors solely on the basis of a presumed group bias violates both the state and federal Constitutions. (*Wheeler*, *supra*, 22 Cal.3d at pp. 276-277; *Batson*, *supra*, 476 U.S. at p. 89.) The prohibition of such challenges extends to gender bias. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341; *J.E.B. v. Ala. ex rel. T.B.* (1994) 511 U.S. 127, 130-131.)

In reviewing a *Wheeler*/*Batson* motion, the trial court engages in a three-step inquiry: the first requires the objecting party to make a prima facie showing of prohibited group bias; in the second, the burden shifts to the party who exercised the peremptory challenge to give a nondiscriminatory reason; and in the third step, which is the relevant inquiry here, the court determines whether the objecting party has proven purposeful discrimination. (*People v. Silva* (2001) 25 Cal.4th 345, 384; *Purkett v. Elem* (1995) 514 U.S. 765, 767.) "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike. [Citation.] The three-step procedure also applies to state constitutional claims. [Citations.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*).)

Here, women made up 80 percent of the panel of prospective jurors, and the prosecutor challenged 10 men and 8 women. Defendant made *Wheeler*/*Batson* motions with regard to five of the men, Juror Nos. 6789, 6360, 3881, 9882, and 8535. The trial court expressly found a prima facie case of purposeful discrimination as to four of the prospective jurors, made no express finding as to one, but in all five instances, the court required the prosecutor to articulate her reasons for the challenge. The court found the prosecutor had justified each challenge with a nondiscriminatory reason, and denied all five motions. Under these circumstances, appellate review "'skip[s] to *Batson*'s third stage to evaluate the prosecutor's reasons for dismissing [the male] prospective jurors.' [*Citations*.]" (*People v. Riccardi* (2012) 54 Cal.4th 758, 786-787 (*Riccardi*).)

"'[T]he critical question in determining whether a prisoner has proved purposeful discrimination' at a third-stage inquiry 'is the persuasiveness of the prosecutor's justification for his peremptory strike . . .' [and] whether the trial court finds the prosecutor's [gender]-neutral explanations to be credible. Credibility can be measured

by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citations.]" (*Riccardi*, *supra*, 54 Cal.4th at p. 787, quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 338-339.) "'"As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"' [Citations.] [¶] Accordingly, because the trial court is 'well positioned' to ascertain the credibility of the prosecutor's explanations and a reviewing court only has transcripts at its disposal, on appeal '"the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous.' [Citations.]" (*Riccardi*, *supra*, at p. 787; *Miller-El v. Cockrell*, *supra*, at pp. 339-340.)

With these principles in mind, we turn to the five challenged male jurors and the prosecutor's reasons for dismissing them. We find no merit to defendant's contention that all or any one of the reasons was pretextual or reflected a discriminatory purpose.

### A. *Juror No. 6789*

The prosecutor stated that Juror No. 6789 was "obviously very strange"; his responses on the written questionnaire were eccentric and the questionnaire speaks for itself; his oral responses appeared to be an attempt to be funny, and he could not give a straight answer. Defendant disagrees, finding Juror No. 6789's responses to be straightforward and sober. Defendant does not set forth what responses she finds to be straightforward or serious, and does not contend that the absence of the questionnaires from the appellate record prejudiced her ability to meet this issue. Further, defendant did not dispute below that Juror No. 6789 appeared to be attempting humor. For these reasons, we must accept the prosecutor's characterization of the prospective juror's demeanor and her representation as to the content of questionnaires. (See *People v. Heard* (2003) 31 Cal.4th 946, 970.)

Moreover, the record does show that Juror No. 6789 may not have taken the questions seriously. For example, in response to the prosecutor's question whether he

23

knew children or had ever worked with children, Juror No. 6789 replied, "Not in the manner of this question." In addition, when the trial court was reviewing questionnaires it noted that in answering the question whether he would follow the law even if he disagreed with it, Juror No. 6789 replied, "I guess if I have to."

### B. Juror No. 6360

The prosecutor explained that Juror No. 6360 had no children or any experience with children and did not know whether he ever wanted to have children. Defendant contends that this was not a sufficient reason because Juror No. 6360 was "devoid of bias"; however, defendant does not contend that the prosecutor was required to show cause for dismissing the juror with a peremptory challenge. In fact, "[t]he justification need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice. [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 136.)

### C. Juror No. 3881

Again, the prosecutor's stated reason for rejecting this juror was that he had no children and little experience with children. The prosecutor explained that it was her intent to eliminate jurors without experience with children. She also stated that this prospective juror gave a "wise ass answer to No. 17" and slouched in the jury box. The court agreed, commenting that Juror No. 3881 gave a flippant and sarcastic explanation of why he did not have children, when he wrote, "I like to use protection." Defendant does not explain why the prosecutor's reasons were invalid and cites no authority in support.[17]

---

[17] Defendant makes no argument at all with regard to this prospective juror other than noting out of 11 peremptory challenges, Juror No. 3881 was the seventh man challenged by the prosecutor. The relevance of defendant's observation is unclear, as the trial court ruled that a prima facie case was in fact established due to the ratio of men to women rejected by the prosecutor. Despite the trial court's ruling, the mere statistical disparity between the number of men and women challenged did not establish a prima facie inference of discriminatory motive, and thus required no explanation by the prosecutor. (See *People v. Carasi* (2008) 44 Cal.4th 1263, 1294-1295.)

24

### D. *Juror No. 9882*

Explaining her challenge to Juror No. 9882, the prosecutor noted that the prospective juror wore inappropriate clothing to court: jeans and a "chintzy" T-shirt. The prosecutor also rejected him due to his constant twitching. The court observed that Juror No. 9882 was constantly moving his legs, did not sit still, and appeared to be under the influence of a stimulant. The court also noted that Juror No. 9882 sat in the back corner of the courtroom wearing a purple watch cap with his juror badge attached to the cap. When asked to remove the cap, he displayed "a little bit of an attitude."

Defendant contends that the prosecutor's reason was insufficient because it was based solely on the prospective juror's demeanor. On the contrary, so long as the prosecutor's reasons are genuine and neutral, "[a] prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.]" (*Lenix*, *supra*, 44 Cal.4th at p. 613.) The authorities on which defendant relies did not hold otherwise; in those cases the prosecutor's reasoning was so lacking in detail as to be no reason at all. (See *People v. Allen* (2004) 115 Cal.App.4th 542, 551-553 ["her demeanor" without more]; *People v. Turner* (1986) 42 Cal.3d 711, 725 ["something in her work" without more]; and *McClain v. Prunty* (9th Cir. 2000) 217 F.3d 1209, 1223 [elbow on her chair].) Here, there was ample detail to support a genuine, gender-neutral reason to excuse the prospective juror.

### E. *Juror No. 8535*

The prosecutor excused Juror No. 8535 because his wife was a forensic nurse and he was not very articulate. The court agreed that the prospective juror did not have a clear answer about his wife's work, such as whether she conducted sexual assault examinations or examined child abuse victims. Defendant contends that this challenge was improperly permitted because "[o]ne would think that a judge in a criminal court and a prosecutor would know the meaning of forensics."

Defendant argues that an "instructive" case is *People v. Long* (2010) 189 Cal.App.4th 826, where the judgment was reversed because the prosecutor's demeanor-based reason was contradicted by the record. (*Id*. at pp. 839, 847-848.) The application

of that case to Juror No. 8535 or any other prospective juror in this case is unclear as the prosecutor's reasons here were supported by the trial court's own observations.

### F. Even-handed justice

Defendant contends that the trial court's rulings on the parties' *Wheeler* motions demonstrated bias. In particular, defendant contends that the court accepted the prosecutor's challenge to men without children, while rejecting defense counsel's attempt to eliminate jurors with work experience caring for children. We find no bias or inconsistent rulings in the record. Defendant's complaint involves one prospective juror, Juror No. 8832, the fourth African-American woman challenged by the defense. Defense counsel explained that Juror No. 8832 had worked in a day care center for two years, helping with homework, changing diapers, toilet training, and transportation from school. He also reported that defendant claimed Juror No. 8832 had given defendant "dirty looks" throughout the proceedings.

The trial court discredited the first reason, noting that defense counsel had permitted non-African-American parents and teachers to remain on the panel. The court rejected the second justification, as defense counsel admitted he had not observed the alleged dirty looks, and despite closely watching, the court had observed no looks indicating animosity or ill will.

As defendant does not contend otherwise, we assume the court's reasoning was supported by substantial evidence. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 196.) In addition, defendant does not contend that the ruling was error; she merely complains that it was not fair. We agree with respondent that the circumstances, as well as a review of the entire record of voir dire demonstrate that the trial court made "'a sincere and reasoned effort'" to evaluate the reasons offered by both sides, and the court's conclusions are therefore "'entitled to deference on appeal.'" (*Lenix*, *supra*, 44 Cal.4th at p. 613.) As defendant has made no showing of error or bias, we defer to the trial court's conclusions.

**III. *Massiah* Motion**

Defendant contends that the trial court erred in denying her motion to suppress the testimony of Doe regarding his conversations and correspondence with defendant.

The motion was brought pursuant to *Massiah, supra*, 377 U.S. 201, which held that surreptitious interrogation by a government agent may interfere with a defendant's Sixth Amendment right to counsel. "To prevail on a *Massiah* claim, a defendant must show that the police and the informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks. [Citations.] 'Specifically, the evidence must establish that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements.' [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 67.)

"Whether to allow an informant's testimony is 'an essentially factual question, and we review it on a deferential standard.' [Citation.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1247-1248.) We thus defer to the trial court's factual findings if supported by substantial evidence. (*People v. Wilson* (2005) 36 Cal.4th 309, 345.) As in any substantial evidence review, we examine the record in light most favorable to the trial court's ruling. (See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1046.)

The trial court found no government involvement in Doe's discussions with defendant when their proximity on the custody bus was coincidental. However, after the time detectives arranged to have Doe deliberately placed near defendant the conversations between them were deliberately arranged and thus excluded. The court thus ruled that the information Doe obtained during those early conversations was admissible, including defendant's unsolicited statements which Doe relayed to Sergeant Nava in an interview recorded on February 24, 2010.[18]

---

[18] The trial court did not specify a particular date for the admissibility of the information provided by Doe, and the record does not reflect the date when Doe began recording his conversations with defendant.

27

Defendant contends that Doe was a government agent from the time of his first conversation with her on the custody bus, and that the agency relationship was either express or implied by Doe's preexisting relationship with law enforcement officers other than those involved in the investigation of this case. She thus contends that all conversations with Doe should have been suppressed.

A preexisting arrangement may be inferred from a prior working relationship with law enforcement; however, "[o]nce the defendant establishes 'a preexisting arrangement,' the 'defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.' [Citation.]" (*People v. Fairbank, supra*, 16 Cal.4th at p. 1247; see, e.g., *In re Neely* (1993) 6 Cal.4th 901, 916-818; *United States v. Henry* (1980) 447 U.S. 264, 266-268.) Thus, "a Sixth Amendment violation occurs when the government intentionally creates or knowingly exploits a situation likely to induce the defendant to make incriminating statements without the assistance of counsel, but not when the government obtains such statements through happenstance or luck. [Citations.]" (*People v. Dement* (2011) 53 Cal.4th 1, 33-34 (*Dement*).)

To determine whether Doe was a government informant, the trial court conducted a hearing outside the jury's presence, taking the testimony of Doe, Deputy Alan Sims (Doe's jailer or "module officer" in the county jail), Sergeant Nava, and Deputy District Attorney Theodore Swanson (Doe's prosecutor) (Swanson). The court also reviewed recorded interviews of Doe, including an interview conducted by Sergeant Nava and another detective on February 24, 2010.

Defendant argues that the agency relationship was established with Sergeant Nava's statement to Doe that he would be an agent with a badge. The badge statement was made during Doe's February 2010 recorded interview by Sergeant Nava and another detective. Sergeant Nava testified at the hearing on the *Massiah* motion that it was a joke. Indeed, the humor is obvious: "Detective No. 1" told Doe there were guidelines they were required to follow, and when Doe suggested ways in which he could elicit information from defendant, the following colloquy ensued:

28

"Det. No. 2: Okay. 'Cause this is the problem that we would have. Because now obviously you're gonna become our agent is what it is.

"[Doe]: Do I get a badge?

"Det. No. 1: You want one of them gold sticker ones?"

Substantial evidence supports the trial court's finding that Doe was not a government agent under an express or implied arrangement with law enforcement prior to the time he was deliberately placed near defendant on the bus or in lockup. Doe had been in jail since July 2008, as his first trial ended in a hung jury and while he was awaiting his second trial. Doe was in protective custody and was guarded by Deputy Sims almost daily. Sometime prior to September 2009, Doe met defendant when they coincidentally rode the bus together from jail to the courthouse. In September 2009, defendant began sending Doe letters. In October 2009, after several conversations with defendant in which she gave conflicting stories, Doe informed Deputy Sims that he had information about defendant and asked Deputy Sims to contact homicide detectives. Sergeant Nava received approval from the office of the district attorney sometime in December 2009 to use Doe's information. Sometime after that, Doe was deliberately placed near defendant on the bus and in lockup, while he had a recorder in his pocket.

Deputy Sims testified that Doe did not ask for anything in return for the information. When Deputy Sims told Doe that he could not offer him anything or make promises, Doe said he felt compelled to do the right thing. Sergeant Nava and Doe both testified that Doe never requested a deal or leniency in his pending case, was never promised any benefit, was not threatened or instructed, other than to be told not to ask defendant any questions.

Swanson testified that when Doe's case was called for a second trial, the parties negotiated a plea agreement. To Swanson's knowledge, the information provided by Doe in this case had no bearing on that agreement, and the resolution of Doe's case was based

29

solely on the facts and evidence in his case.[19]  Doe testified he came forward because he was opposed to crimes against women and children.  He testified, "I am not a government informant."

Defendant contends that "[Doe] had been working as a government agent for years" and had testified as a government informant in a least one prior case.  Defendant infers this from Doe's speaking relationship with his jailer, Deputy Sims.  She also relies once again on discussions by counsel rather than evidence and on evidence that was only presented at trial.  Appellate review is limited to the evidence before the court when it heard the *Massiah* motion.  (*People v. Hartsch* (2010) 49 Cal.4th 472, 491.)  We thus disregard any additional evidence and argument, and discuss the issue in relation to the evidence presented prior to the court's ruling on the motion.

The actual evidence presented at the hearing on the *Massiah* motion showed that at most, Doe was a witness in a prior case.  Deputy Sims testified that he saw Doe almost daily for several years and they had conversations, but not with Doe as an informant.  When asked about prior relationships with law enforcement, Doe denied he was ever a "snitch" or government informant.  Doe explained that he came forward in 2007 with information against the Mexican Mafia, but he was promised nothing and received no benefit other than severing ties with a gang affiliated with the Mexican Mafia.  A debriefing process to end a gang affiliation does not transform a witness into a government agent.  (*Dement*, *supra*, 53 Cal.4th at p. 34.)  Doe also denied he was a government informant in a 2008 situation.  Rather, he was merely a witness placed in paid housing for his protection.

Defendant suggests the court should not have believed Doe when he claimed that he expected to receive nothing in exchange for his information.  She points out that in the past, Doe had received such benefits as a preferred cell assignment, protective housing as

---

**19**      At the conclusion of evidence the two following stipulations were entered: "witness, John Doe, received no leniency or benefit in the case he had pending in . . . Antelope Valley in return for furnishing information to law enforcement about [defendant]"; and "no letter of mitigation or leniency in that pending case of John Doe was received by the District Attorney's office."

a witness, and a very beneficial plea bargain after his first jury deadlocked. Defendant argues that such evidence showed that Doe came forward because he expected something in return for his information and knew from having received benefits in the past that he could manipulate the system. As our review is deferential, we must accept the trial court's resolution of credibility conflicts. (*People v. Tully* (2012) 54 Cal.4th 952, 979.) Moreover, a witness does not become a government agent simply by coming forward with information, even if he subjectively believed that he would benefit by doing so. (*Dement*, *supra*, 53 Cal.4th at p. 33.)

Even if Doe had been a government agent in a prior case, no evidence suggests that anyone involved in the investigation or prosecution of *this* case knew of such a relationship. We conclude that defendant failed to meet her burden of showing that any admitted evidence was obtained under an express or implied preexisting arrangement. Further, as the prosecution was not allowed to use any information obtained after Doe was deliberately placed near defendant, she was not harmed or prejudiced by the trial court's ruling.

## IV. Limitations on impeachment

Defendant contends the trial court abused its discretion by limiting the cross-examination of Doe and that the trial court's rulings prevented her from presenting a complete defense, thus depriving her of constitutional rights to due process and a fair trial.

"'[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' [Citation.]" (*Dement*, *supra*, 53 Cal.4th at p. 52.) Further, the constitution does not prohibit the trial court from imposing reasonable limits on cross-examination. (*People v. Sapp* (2003) 31 Cal.4th 240, 290.) As defendant did not make a constitutional argument below, we do not reach her due process claim unless and until she establishes error under state law. (*People v. Thornton* (2007) 41 Cal.4th 391, 443-444; *People v. Partida* (2005) 37 Cal.4th 428, 435-439.)

Rulings on the admissibility of evidence are reviewed for abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113.) "Under this standard, a trial court's

ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*Ibid.*) Discretion is not abused unless "the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*People v. Williams* (1998) 17 Cal.4th 148, 162.)

The burden to demonstrate an abuse of discretion falls to the party challenging the court's ruling. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion [citations]." (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

### A. Routine questions

Defendant complains the trial court did not permit the defense to ask Doe "[r]outine questions designed to ferret out bias." Defendant also contends the court should have permitted questions regarding Doe's surreptitious recording of conversations with defendant, information or testimony Doe had previously given as a government agent or witness, and about an incident in which a woman accused of child abuse asked Doe to kill the child's father.

Defendant suggests that questions regarding information or testimony Doe gave as a government agent should not have been excluded because Doe admitted he had worked as a government agent in the past. On the contrary, Doe denied having worked as a government agent, as the trial court pointed out to defense counsel.

Defendant's contention regarding the recorded conversations also lack merit. As respondent notes, defendant has made no effort to summarize the trial court's reasoning or to explain why she believes it was erroneous, and has thus failed to demonstrate error. The trial court excluded questions about the surreptitious recordings but did not preclude the defense from playing the tapes. The court explained that the prosecution was precluded under *Massiah* from playing the tapes; thus, if the defense questioned Doe about the recordings or played any part of them for the jury, the *Massiah* objection would

32

be deemed waived, and the balance of the tapes would become admissible under Evidence Code section 356.[20] Defendant suggests that the court should have excised irrelevant parts of the recording despite Evidence Code section 356, leaving only those parts that would impeach Doe's credibility without disturbing the court's *Massiah* ruling. She claims that the court had the authority and discretion to do so; however, as defendant did not ask the trial court to excise parts of the recordings, she "cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida*, *supra*, 37 Cal.4th at p. 435; see also *People v. Burns* (1987) 196 Cal.App.3d 1440, 1455.)

Defendant next contends that Doe asked a woman accused of child abuse for money to kill her child's father; and she contends that the incident would have cast doubt on Doe's claim to have come forward in this case due to a disapproval of crimes against children. The record does not support defendant's contention. The trial court reviewed and quoted from a transcript of the interview in which Doe described the incident to law enforcement. In response to the woman's proposal, "[Doe said], 'I can't believe she asked me that' and then [Doe said], 'I was like, where's the money at?'" Rejecting defense counsel's interpretation of Doe's comment, the trial court found that when viewed in context, "it was clearly a sarcastic or facetious remark by the witness." The court concluded that the remark did not undermine Doe's claim that he did not like crimes against children, and was thus irrelevant.

Disregarding the trial court's finding, defendant simply restates defense counsel's view that Doe asked for money; defendant does not contend that the court's interpretation was arbitrary, capricious or patently absurd, or even erroneous. It is not enough to present facts that would merely support a different opinion. (*People v. Clair* (1992) 2

---

[20]    In relevant part, Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party." Defendant did not play the recordings for the jury. Although defendant claims that she was precluded from playing the recordings by the trial court's refusal to approve funds to have the recordings transcribed, she fails to provide a citation to the record where such funds were requested or denied.

Cal.4th 629, 655.)  Nor is it sufficient merely to argue that reasonable people might disagree with the trial court.  (*People v. Preyer* (1985) 164 Cal.App.3d 568, 573.) Defendant has not met her burden to demonstrate an abuse of discretion.

### B.  *Doe's prior convictions*

Defendant argues that the trial court should have allowed her to impeach Doe with all six of his prior convictions involving moral turpitude, rather than just the most recent three of them, and to ask Doe how long he had been in custody.  At trial defense counsel sought to impeach Doe with five felony convictions and one misdemeanor:  robbery conviction in 1993; petty theft with a prior in 1996; first degree burglary in 1998; spousal abuse in 2004; receiving stolen property in 2005; robbery in 2010; and assault with a firearm in 2010.  Relying on Evidence Code section 352, the trial court excluded the misdemeanor conviction for domestic violence without stating a reason, and excluded the 1993, 1996, and 1998 convictions as too remote when balanced against their probative value.

Defendant acknowledges that Evidence Code section 352 provides the trial court with discretion to exclude impeachment with remote prior convictions.  (See *People v. Clair*, *supra*, 2 Cal.4th at p. 655; *People v. Castro* (1985) 38 Cal.3d 301, 307-308.)  She contends, however, that it is necessarily an abuse of discretion to find a prior conviction remote unless the witness has led a crime-free life since the last of the excluded convictions.  Defendant has cited no authority for this position and we have found none.[21]

We agree that intervening convictions which are probative of credibility may favor admitting a remote prior conviction.  (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 926 (*Mendoza*).)  In addition, a series of crimes may be more probative of dishonesty than a single offense.  (*People v. Clark, supra*, 52 Cal.4th at p. 932.)  Thus the trial court was

---

**21**     Defendant relies on *People v. Humphrey* (1997) 58 Cal.App.4th 809, a case that did not involve impeachment with prior convictions and which is thus inapplicable. There, an abuse of discretion was found after the trial court struck a prior conviction under section 1385 for purposes of the "Three Strikes" law.  (See *Humphrey*, *supra*, at p. 813.)

not *precluded* from admitting all the prior convictions; however, the number to be admitted remained within the court's discretion. (*Id.* at pp. 932-933; *Mendoza*, at p. 927.) In exercising its discretion, the trial court may and should consider consumption of time along with other factors. (*People v. Wheeler* (1992) 4 Cal.4th 284, 296-297.) We thus decline to hold categorically that a trial court may not limit the number of prior convictions to be used for impeachment.

Moreover, there is no merit to defendant's contention that limiting the impeachment to three felony convictions gave Doe the "false aura of veracity" that might result when impeachment is limited to just one or two prior convictions. (*Mendoza, supra*, 78 Cal.App.4th at p. 927; see also *People v. Hinton* (2006) 37 Cal.4th 839, 888.) The trial court did not limit impeachment to one or two prior convictions, but admitted three felonies: receiving stolen property; robbery; and assault with a firearm. We agree with respondent that impeachment with additional prior convictions was not reasonably likely to produce a result more favorable to defendant.

No abuse of discretion is demonstrated without showing a "resulting injury [that] is sufficiently grave to manifest a miscarriage of justice. [Citation.]" (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.) Doe's credibility was amply eroded with the three prior felonies, particularly when combined with Doe's testimony that he was in custody serving a prison term at the time of this trial testimony and had been in custody for three years when he came forward with information about his bus conversations with defendant. In addition, Doe admitted he was a snitch in this case and had been a snitch in a prior case, and that he intentionally gained defendant's trust to obtain information from her. It is highly improbable that the jury harbored any illusions about Doe.

### C. No constitutional error

As the trial court properly exercised its discretion under Evidence Code section 352, exclusion of the impeachment evidence did not deprive defendant of a defense or due process. (See *Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327.) Moreover, defendant's constitutional claim fails because the impeachment evidence would not have ""'"produced a significantly different impression of [Doe's] credibility."'"" (*Dement*,

*supra*, 53 Cal.4th at p. 52.)  Defendant admitted she had sent letters to Doe.  Defendant's letters were highly probative of her motive and did not depend upon Doe's truthfulness.

## V.  Other evidentiary errors

Defendant contends that the trial court committed four additional evidentiary errors that resulted in an unfair trial and a denial of due process:  (1) the court unduly limited photographic evidence as cumulative; (2) the court erred in admitting the letters defendant wrote to Doe; (3) the evidence of defendant playing "beer pong" before Emma's funeral should have been excluded as unduly inflammatory; and (4) the court unfairly limited evidence tending to dispel the suggestion that defendant planned to flee to Texas.

As before, we review the trial court's rulings deferentially, finding an abuse of discretion only upon a showing that the court's decision was made in an "arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]"  (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1113.)

### A.  Photographs

Defendant contends that the trial court excluded as cumulative most of the photographs she wanted to use to demonstrate the nature of her relationship with Emma. Defendant claims that the trial court limited the defense to 5 of the 52 photographs offered, resulting in her inability to produce photographs taken after December 31, 2008. Defendant asserts that the court's ruling permitted the prosecutor to unfairly argue that defendant took almost no photographs of Emma after she became obsessed with Borrelli. Defendant adds that the trial court permitted defense counsel to show the jury the two photograph albums Gary had identified in his testimony, but prohibited showing the jury the photographs contained in the albums.

A trial court has broad discretion to exclude cumulative evidence.  (*People v. Pride* (1992) 3 Cal.4th 195, 235; see Evid. Code, § 352.)  It is defendant's burden to establish an abuse of that discretion.  (*People v. Superior Court (Alvarez)*, *supra*, 14 Cal.4th at p. 977.)  Defendant does not claim that the two albums or the 52 photographs have been preserved in the appellate record and we do not find them among the trial

exhibits. Thus defendant has not provided this court with the means to review the ruling. As we are not required to guess whether the excluded photographs were or were not cumulative we find no error. (*People v. Booker* (2011) 51 Cal.4th 141, 171.)

Moreover, respondent correctly observes that defendant has mischaracterized the record.[22] After both parties had rested, defense counsel informed the court that he intended to show photographs that had not been admitted into evidence, in order to counter the prosecution's claim that defendant took no photographs of Emma after December 31, 2008. When defense counsel stated that the court had limited him to showing five photographs, the court replied: "Hold on here. What I did was I limited the number of photographs that could be used for character evidence. Had you tried to present photographs to rebut [the prosecutor's] claims during the evidentiary portion of the trial that photographs were taken subsequent to a certain date, those certainly would have been relevant."

The court then allowed defense counsel to show the jury two albums which had not been admitted into evidence, because Gary had identified them in his testimony. The court added that counsel could not mention specific dates photographs were taken unless there was evidence of such dates. The trial court did not rule that the photographs in the two albums could or could not be shown to the jury during argument. The discussion then turned to a video that included portions that had been played for the jury and portions that had not been played for the jury.

We must presume that the trial court's order or orders were correct. (See *People v. Wiley* (1995) 9 Cal.4th 580, 592, fn. 7; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) If the trial court ruled that most of the photographs were cumulative as to defendant's character or some other point, and if the trial court precluded defense counsel from showing the jury the photographs in the two albums, it is impossible to review the

---

[22]    The trial court did not rule on the admissibility of the photographs. Instead, the court instructed counsel to confer and determine which photographs, if any, were objectionable to the prosecutor. Defendant has not referred to any page in the record reflecting the result of counsel's conference. In her reply brief, defendant acknowledges respondent's contention but fails to justify her assertions with citations to the record.

rulings for error on the record submitted and we must presume that the trial court had a proper basis for its ruling. (See *People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)

### B. Defendant's letters to Doe

The trial court admitted 12 of the 23 letters defendant wrote to Doe while she was in jail. Defendant contends that the trial court erred because the letters "were vastly more prejudicial than probative, and cumulative to boot."[23]

The prosecution sought to admit all 23 letters. Defendant objected pursuant to Evidence Code section 352 as they were cumulative and prejudicial. The trial court's ruling will be upheld on appeal absent clear abuse and so long as the record affirmatively shows that the trial court weighed the prejudicial effect of the evidence against its probative value. (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Here the trial court expressly engaged in the required balancing. Although the court found that the fact that there were 23 letters was highly probative of obsession, the court excluded 11 of them, finding that the probative value of 12 letters outweighed any prejudice. The trial court agreed with the prosecution that the letters were highly probative of defendant's tendency to obsess over her boyfriends, and thus supported the theory that defendant's motive was rooted in her obsession with Borrelli.

We agree that the letters were probative of the prosecution's motive theory and that their probative value was not outweighed by prejudicial effect. "'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.) We find no abuse of discretion.

### C. Beer pong

Defendant objected to the introduction of evidence regarding the game of beer pong played at the Barker residence the night before Emma's funeral. Defendant

---

**23**    As defendant provides no comparison and points to no particular parts of the letters to demonstrate their cumulative nature, we decline to make that analysis on her behalf. (See *People v. Booker*, *supra*, 51 Cal.4th at p. 171.)

contends the evidence should have been excluded as unduly prejudicial because not everyone is familiar with family wakes at which alcohol is served.[24]

Defendant also contends that the evidence was unduly inflammatory because defendant's participation in the game could suggest to the jury that she experienced no remorse over Emma's death. The absence of remorse can be relevant to a defendant's guilt. (See *People v. Bell* (2007) 40 Cal.4th 582, 606.) Defendant did not object on this ground at trial but merely suggested that "post-incident" behavior was not probative of "pre-incident" behavior. Thus, the issue is not preserved for review. (See *People v. Partida*, *supra*, 37 Cal.4th at pp. 434-435; Evid. Code, § 353.)

In any event, no prejudice resulted. Although Villalobos testified that defendant appeared to him to be intoxicated and to giggle, he could not remember her demeanor prior to playing the game. On the other hand, Gary testified that defendant seemed sad and tired, and had to be persuaded to get out of bed to play with the others. Susan testified she was the one who asked defendant to play and that she and everyone at the gathering played, but not for very long, less than an hour, because it was how they attempted to deal with the death. Under the circumstances and on balance such evidence was not unduly prejudicial.

### D.  Move to Texas

Defendant asserts the trial court erroneously prohibited testimony from Kimberlee regarding the reasons she offered to let defendant live with her in Texas. Defendant wanted to have Kimberlee testify that she made the offer because she knew the Barker family was undergoing a lot of stress, especially given that there had been personal attacks on the family because defendant still lived there and because of the newspaper coverage. The trial court allowed only Kimberlee's testimony that she lived in Texas and invited defendant to live there.

---

[24]     When defense counsel made this argument below, the trial court assured him that he would be permitted to call a witness to explain the custom. No such witness was called although Gary testified that the game was commonly played in his family and it was played the night before Emma's funeral in an attempt to find some comfort and to release tension.

39

Defendant contends that Kimberlee's reasons for making the offer were admissible as evidence of her state of mind. (See Evid. Code, § 1250, subd. (a) [state of mind of declarant admissible if relevant].) Without the testimony, the jury was left with the impression that defendant intended to flee to avoid arrest. Defendant's contention lacks merit. As respondent notes, the evidence was offered to prove defendant's state of mind, not the declarant's, and Kimberlee had no personal knowledge of the events in or around the Barker home.

Further, as respondent also notes, no miscarriage of justice can be shown. (See Evid. Code, § 354.) Ample evidence showed Kimberlee's probable motivation for making her offer. Gary explained that after Susan attacked defendant in bed, both Gary's father and his sister invited defendant to live with them until the tension settled. Susan testified that defendant moved out of the family home because there were arguments and because someone had put a sign on the front lawn and yelled, "baby killer." The evidence defendant intended the jury to hear was admitted, albeit not from Kimberlee.

### E. No uneven treatment

Defendant contends the trial court treated the parties inconsistently, admitting "all sorts of evidence to support [the prosecutor's] theories" while excluding evidence needed to disprove them. We disagree, as defendant has not demonstrated that any of the rulings were an abuse of the trial court's discretion.

## VI. CALCRIM No. 362

Defendant claims that the court prejudicially erred by reading CALCRIM No. 362 as follows:

> "If the defendant made a false or misleading statement relating to the charged crime knowing the statement was false or intending to mislead, that conduct may show she was aware of her guilt of the crime and you may consider it in determining her guilt. If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

40

Defendant objected to the instruction, claiming it was inapplicable because she did not make a "statement relating to the charged crime." Defense counsel explained to the trial court: "Once she began to tell the truth, that was the truth. Therefore, the false statements as to the initial investigation cannot be used to bootstrap a conviction as to the charged crimes based on this particular instruction." The court overruled the objection, noting that if the jury found the claim of accidental death was false, it could consider the claim as a consciousness of guilt.

CALJIC No. 2.03, the nearly identical predecessor to CALCRIM No. 362, has repeatedly been upheld by the California Supreme Court against a variety of challenges. (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1103, fn. 3; see, e.g., *People v. Watkins* (2012) 55 Cal.4th 999, 1028; *People v. Nakahara* (2003) 30 Cal.4th 705, 713; *People v. Arias, supra*, 13 Cal.4th at p. 143.) The instruction has been held to be proper whenever the jury could reasonably believe that the defendant lied about the charged crimes prior to trial. (*People v. Stitely* (2005) 35 Cal.4th 514, 555.) Applying the same reasoning, we reject defendant's contention that CALCRIM No. 362 is inapplicable unless the defendant's statements somehow mirror the allegations of the charging document.

Defendant also contends that because she never wavered from her claim that Emma's death was accidental, the statements were the equivalent of a claim of innocence, not a false statement. Defendant argues that a false claim of innocence amounts to a mere false denial, not affirmative evidence from which to infer a consciousness of guilt. A similar contention was rejected in *People v. Williams* (2000) 79 Cal.App.4th 1157, because any such use of the instruction would necessarily be harmless under any standard. The court observed: "The instruction would apply only if the jury found the denial to be false, and this would necessarily mean that the jury accepted the prosecution's evidence and rejected the defense case. Under such circumstances, the inference of guilt arising from a 'false' denial of guilt could add nothing to the jury's evaluation of the evidence and determination of guilt." (*Id*. at pp. 1166-1167, fn. 8.)

41

Defendant also appears to be asserting that a consciousness of guilt is not properly inferable whenever a defendant's pretrial statements are consistent with her trial testimony. If so, the same argument has been made and rejected in relation to CALJIC No. 2.03: "The falsity of a defendant's pretrial statement may be shown by other evidence even when the pretrial statement is not inconsistent with defendant's testimony at trial." (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1103-1104 (*Edwards*); see also *People v. Kimble* (1988) 44 Cal.3d 480,496.) Thus, it is proper under such circumstances to instruct the jury that it may infer guilt from defendant's false pretrial statements. (*Edwards*, *supra*, at pp. 1101, 1103-1104.)[25]

We conclude that the instruction was properly given under the circumstances. Regardless, any error would be harmless under any standard. Defendant's claim that the death was an accident was not her only false pretrial statement; she created an elaborate ruse to mislead the police, claiming to have been attacked and knocked unconscious, and feigning ignorance of Emma's whereabouts. Such calculated and extreme falsehoods undoubtedly went further to imply a consciousness of guilt than defendant's accident claim. Moreover, defendant has not challenged the reading of CALCRIM No. 371, which instructed the jury that an attempt to create false evidence may show an awareness of guilt. Given such circumstances, there is no likelihood that omitting CALCRIM No. 362 would have produced a more favorable result.

## VII. Substantial evidence

Defendant contends that her convictions on all three counts must be reversed due to insufficient evidence supporting them. In the alternative, she contends that count 1 must be reduced from murder to involuntary manslaughter due to insufficient evidence of deliberation and premeditation.

---

[25] Respondent cited *People v. Beyah* (2009) 170 Cal.App.4th 1241 (*Beyah*) in support of CALCRIM No. 362, prompting defendant to argue at length in reply that *Beyah* is inapplicable here. We agree that it is inapplicable, as *Beyah* involved false testimony, not a pretrial falsehood as in this case or as in *Edwards*. As we find *Edwards* dispositive, we refrain from weighing in on the parties' *Beyah* arguments.

When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*Ibid.*) We do not reweigh credibility or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

We begin with the presumption that substantial evidence supports the verdicts, and it is defendant's burden to demonstrate otherwise. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1572-1573.) In an apparent attempt to meet her burden, defendant summarizes a few conflicts in the evidence and contends that the conflicts demonstrated that the prosecutor's arguments were speculative. We reject any suggestion that a conviction must be reversed for insufficient evidence due to speculative arguments by the prosecutor. Evidence is not insufficient "merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] . . . [¶] Before the judgment of the trial court can be set aside for insufficiency of the evidence . . . , it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. [Citation.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

We agree with respondent that the evidence sufficiently supports the jury's finding of premeditation and deliberation. "We normally consider three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported -- preexisting motive, planning activity, and manner of killing -- but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 645-646.)

43

First, evidence of defendant's preexisting motive was compelling. Defendant had a tendency to become obsessively involved with boyfriends, focusing completely on them to the exclusion of all else, as demonstrated by her elaborate love letters to Doe, her attempt to look Hispanic for a Latino boyfriend, and her desire to spend all her spare time with Borrelli, with whom she exchanged texts or telephone calls 50 to 75 times per day. Defendant spent less and less time with Emma, putting her to bed earlier, staying out later, and leaving the house for longer periods, in order to spend more time with Borrelli. Just before Emma's death, defendant came under increasing pressure in her relationships with Borrelli, Emma, and her mother. Hannaford was not involved in Emma's life and defendant was not getting along well with Susan. Borrelli did not want to be in Emma's life or take any responsibility for her; he refused to have much interaction with her, and avoided defendant when she was with Emma. Defendant confided to her brother she felt Borrelli was afraid of Emma and that she disliked those feelings. Defendant told Borrelli she was concerned that Emma would scare him and he would "take off."

On the day of Emma's death, defendant and Borrelli had an extensive discussion about their relationship and the possibility of Borrelli's seeing more of Emma. Borrelli refused. He told defendant he preferred to wait until he was sure that he could handle a relationship with both defendant and Emma. When defendant returned home, Susan issued her ultimatum, causing defendant to scream that she could not make anyone happy. Defendant could not go on living in Susan's home and felt she had nowhere else to go. Borrelli would not welcome her with Emma, defendant's friend Amber had her "own situation," and defendant was not on speaking terms with her brother Matthew. The jury could reasonably infer from such evidence that defendant was an immature woman who felt trapped by her responsibility to Emma and was desperate due to her obsessive thoughts and ideas.

Second, there was substantial evidence of planning. Defendant began the long drive south with little food or other supplies, and she later admitted to Doe that Emma

died before they left Palmdale.[26]  Defendant did not go to the park as she told Nickolas, and falsely claimed in a text message to Borrelli to be at the park with Emma.  Emma was given twice the therapeutic dose of Benedryl, enough to act as a mild sedative and make Emma sleepy (though not "lethargic").  As no evidence suggested Emma needed the Benedryl and Susan testified she did not give Emma any medication that day, the jury could reasonably infer that defendant gave Emma the high dose of Benedryl to minimize any struggling or discomfort.

Third, the manner of death strongly supported an inference of premeditation and deliberation.  Dr. Ribe determined that the cause of death was asphyxia, and that Emma was suffocated while she struggled to breathe as her nose was either being squeezed or pressure was being exerted on her lower face.  Dr. Ribe testified that the blood in Emma's nostril supported his conclusion.[27]  Dr. Ribe ruled out the suggestion that Emma died due to choking on a plastic bag, as that would not have resulted in the blood in Emma's nose.  Further, a plastic bag would have prevented the foam and fluid to travel to her mouth where it was found, and choking on it would probably have resulted in petechia in the eyes, which was not present.

In sum, the substantial evidence of a preexisting motive, planning activity, and cause of death are consistent with an intentional killing, which sufficiently supports the

---

[26]    Due to the position of Emma's body and degree of rigor mortis at the time her body was discovered, her time of death could have been six hours before being placed there, but might have been as little as two hours.  Contrary to the inferences defendant prefers to draw from the fact that Emma's stomach still contained what may have been the cheese she ate earlier, this evidence does not conflict with defendant's admission to Doe.  Susan gave Emma cheese and crackers at 3:00 p.m., and Dr. Ribe testified that liquids leave the stomach within 30 minutes, but solid foods take from 30 minutes to two hours to digest.

[27]    The blood was visible in the photographs taken where Emma's body was found, and although he did not see the blood during autopsy, Dr. Ribe explained that it may have dried and flaked off.

jury's finding that defendant deliberated and premeditated the murder of Emma. (See *People v. Jennings*, *supra*, 50 Cal.4th at pp. 645-646.)

## VIII.  Cumulative effect

Defendant contends that the cumulative effect of all the errors heretofore discussed was to deny her a fair trial. Because "[w]e have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial," we must reject defendant's claim of prejudicial cumulative effect. (*People v. Sapp, supra*, 31 Cal.4th at p. 316.)

## IX.  *Pitchess* review

The trial court granted defendant's pretrial *Pitchess* motion for discovery of relevant evidence contained in the personnel files and other confidential records of Sergeants Nava and McCarthy.[28] In granting the motion, the trial court limited the review to records relevant to "coercive police tactics." The court conducted an in camera review but found no documents relevant to this issue and thus no discoverable information. Defendant requests a review of the trial court's determination.

We review the trial court's determination for an abuse of discretion. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.) We find the transcript sufficiently detailed to review the trial court's discretion. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229.) Upon review of the sealed record of the in camera proceedings, we conclude that the trial court properly exercised its discretion in determining that no documents existed within the scope of the *Pitchess* motion, and that no documents or information should be disclosed to the defense as a result of the review.

---

[28]     See footnote 3, *ante*.

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.
ASHMANN-GERST

47